323 F.2d 146
 UNITED STATES of America ex rel. Clarence SMITH, Appellant,
v.
The STATE OF NEW JERSEY, the Principal Keeper of the State Prison at Trenton, New Jersey, and the Superintendent of the New Jersey Reformatory at Bordentown, New Jersey.
UNITED STATES of America, ex rel. Lee STANFORD, Appellant,
v.
The STATE OF NEW JERSEY, the Principal Keeper of the State Prison at Trenton, New Jersey, and the Superintendent of the New Jersey Reformatory at Bordentown, New Jersey.
 No. 13821.
 No. 13822.
 United States Court of Appeals Third Circuit.
 Argued April 5, 1962.
 Reargued November 21, 1962.
 Reargued En Banc June 19, 1963.
 Decided August 2, 1963.
 
 Hymen B. Mintz, Newark, N. J., for appellant.
 Brendan T. Byrne, County Pros. of Essex County, Newark, N. J. (Peter Murray, Asst. Pros., on the brief), for appellees.
 Before BIGGS, Chief Judge, and McLAUGHLIN, KALODNER, STALEY, HASTIE, GANEY and SMITH, Circuit Judges.
 McLAUGHLIN, Circuit Judge.
 
 
 1
 Appellants were convicted of first degree murder in the Essex County, New Jersey state court and sentenced to life imprisonment. Thereafter they applied to the United States District Court for the District of New Jersey for a writ of habeas corpus.[1] This appeal is from the denial of that petition. It is fitting to note that it has been presented by both sides carefully and competently.
 
 
 2
 The victim was an elderly man who died from injuries which were found by the New Jersey Supreme Court to have been "* * * sustained in a `mugging' — a term commonly used to describe the vicious act of physical attack upon an isolated pedestrian on a public street at night and the taking of money and effects from his person."[2] On the date of the crime defendant Smith was less than three months short of being eighteen years old. He had progressed at least to the ninth grade in school. He had married thirteen days prior to the crime and at that time was living with his wife. Stanford had become seventeen a month before. In school he had gone as far as the eleventh grade. He had been employed in a local manufacturing plant for about nine months at $44 a week.
 
 
 3
 There is strong, uncontradicted evidence that the decedent, Carmine Dellorto, was attacked by two such persons as the defendants for the purpose of robbery on a Newark, New Jersey street corner near midnight, June 13, 1958. Mr. Dellorto was knocked to the ground, his skull was fractured as his head struck the pavement and he died within a few minutes thereafter. Just prior to the attack he had left a friend's house to go to his bus stop. His wallet was in his hip pocket at that time; it was missing after the assault.
 
 
 4
 There was no eye witness identification of the defendants as the persons involved. On June 23, 1958, David Parker, a resident of defendants' neighborhood told the police that the morning after Mr. Dellorto had been killed, the defendants told him that "they got themselves a cat at 15th Ave. and 10th St. last night." Smith and Stanford were brought to Police Headquarters about four o'clock that afternoon. As the New Jersey Supreme Court held, "There is no indication they were not of normal mind and will." They were questioned separately by the police. At first they denied any connection with the offense. Within from one to three hours, at the latest shortly before 7:00 P.M., Stanford admitted complicity and on being advised of what Parker had said he and Smith had told him the morning after the Dellorto death, gave the details of the crime. Around 9:00 P.M. Smith was confronted with the results of checking out his story of where he had been and who he had been with during the critical period, which established that he and Stanford had been together. Smith then orally confessed his guilt. In addition to the time spent ascertaining whether the various statements of the defendants were true, there was an interval to give all concerned the opportunity of having food. Following that, the written statements, prepared successively by the same detective, were composed and typed; efforts were made to iron out discrepancies on minor matters; the confessions were read over and finally signed about 1:30 A.M.
 
 
 5
 Smith and Stanford were then taken to the Youth House, the county facility for detention of juveniles pending hearing in the juvenile court. A complaint was filed in the latter alleging that the defendants had robbed and killed Mr. Dellorto. This was heard on July 3rd, 1958. At the hearing both defendants were represented by counsel. The complaint and the applicable rule (R.R. 6:9-7) were read. Under the rule where the juvenile is sixteen or seventeen years old and is charged with an offense of heinous nature which may require imposition of sentence or is a habitual offender he is subject to prosecution as an adult on the order of the Juvenile and Domestic Relations Court. The court stated that the defendants were charged with a heinous crime and in addition, from the records before it, were habitual offenders. As a result, under the rule and N.J.S. 2A:4-15, N.J.S.A., the court referred the case to the county prosecutor. The judge correctly ruled that the only necessary element for that action was present i. e. the formal charge of a heinous offense. Both defendants being seventeen, they were within the statutory age bracket. Later the defendants were indicted for murder.
 
 
 6
 The state Supreme Court held that when the defendants were taken into custody they were prime suspects and such action was lawful; that detention at police headquarters for a reasonable opportunity to question was proper in a situation as here presented where the suspects were close to the adult age and the crime charged most serious.[3] The Court further made it very clear that there is no provision in the juvenile rules calling for a preliminary hearing other than the one had and that any further hearing was never contemplated as procedurally indispensable in juvenile matters. The Court examined at length all of the preliminary steps taken and found specifically that there was no substantial violation of any of defendants' rights.[4]
 
 
 7
 It is rightly conceded that only undisputed evidence may be considered on the question of whether the judgments in these cases should be disturbed. Consequently there can be no excuse for cluttering up the serious problem before us with a repetition of contentions on behalf of appellants that had no basis whatsoever in fact or were affirmatively contradicted by evidence which the jury was entitled to, and did, believe. No actual disagreement exists as to this.
 
 
 8
 All of which brings us to the only real question before us — whether defendants' confessions were voluntary.
 
 
 9
 It is asserted on behalf of the appellants that the confessions were coerced. In an effort to support this it is in effect urged that a nine and one-half hour to ten hour period of persistent interrogation during which a suspect is held incommunicado might or might not prove to be overbearing where an adult is involved; that we are dealing with the emotional stability and maturity, or lack thereof, of seventeen year old minors; that the tension and fears pressing down on the mind of a suspect as the result of prolonged and secret police interrogation must be deemed to be multiplied when the prisoner is an adolescent. This theory, while professing to follow the admitted rule that judgment of this issue involves more than a mere matching of cases, considers the Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) facts so much in point that it would accept as comparable the circumstances of this appeal and those in that decision. The other case particularly stressed is Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) with special reference to that part of the opinion which notes that the defendant in the matter "* * * would have no way of knowing what the consequences of his confession were without advice as to his rights * * * and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself."
 
 
 10
 The difference between Haley and Gallegos and these defendants is abysmal. Haley, as that opinion states, 332 U.S. pp. 599-601, 68 S.Ct. pp. 303-304, 92 L.Ed. 224, was "* * * a mere child — an easy victim of the law * * *. Age 15 is a tender and difficult age for a boy of any race. * * * this was a confession wrung from a child by means which the law should not sanction." Young Haley had never been in trouble before and actually did not confess until after he was shown the alleged statements of two confederates which incriminated him. As to Gallegos it is enough to say that he was fourteen years old; that the other boys involved with him were his younger brothers, Charles, age 12, and Richard, age 8.
 
 
 11
 As we have mentioned, at the hearing in the juvenile court, the judge "* * * announced that * * * the court records before him indicated they (Smith and Stanford) were habitual offenders."[5] The argument is made that the Juvenile Court records of Smith and Stanford are not to be considered as weighing too heavily against the other factors to be considered. But what possibly could be a more potent factor to have in mind than the statement of the New Jersey Supreme Court in its opinion unholding the conviction — "There is no suggestion made that this interrogation was a novel experience for them, probably because the juvenile court records earlier mentioned show frequent contacts with the police and courts and the giving of statements in the past."[6] (Emphasis supplied). In Smith's confession he said: "We had made no plans to rob this man but when we got on the corner Lee [Stanford] said `Smith, do you want to get this man' and that is the time I struck the man * *." (Emphasis supplied). The defendants' sophisticated characterization to their friend Parker of their shocking murder of an elderly man the night before and Smith's casual, knowing description of the attitude of himself and Stanford immediately prior to the crime, together with Stanford's query to Smith "* * * do you want to get this man * * *" which Smith answered by knocking the victim to the ground with such force that his skull was fractured and death resulted, all add up to an unmistakable, twisted maturity from which boyish adolescence was long ago and far away. These defendants though young in years were seasoned in crime. They may well have had tensions and fears pressing down on their minds in their realization that they were caught and faced punishment but these were not multiplied because of adolescence in either of them, it was rather because of their awareness of what they had done and the consequences thereof.
 
 
 12
 The nine and one-half to ten hour period of persistent interrogation urged on behalf of appellants, as it is spelled out in the record, offers a substantially different picture. The State's proofs were that Stanford admitted complicity within from one to three hours and as the State Court opinion narrates "* * * related the details shortly after a detective told him Parker had recounted defendants' statements to him the morning after the killing."[7] Smith orally confessed his guilt in about five hours after evidence gathered in the last preceding three hours established that he and Stanford had been together. Smith's wife and Stanford's girl friend were among those interviewed during that period. Also, part of the interlude time was taken up by the defendants' and the detectives' eating. The interim from when Smith orally confessed until the confessions were signed at about 1:30 A.M., was consumed as the State opinion commented, "* * * in trying to iron out discrepancies in details (which, as can be seen from the statements, was never successfully accomplished) and in composing, typing, reading and signing the written statements. The preparation of the latter commenced about eleven o'clock and the two were done successively."[8]
 
 
 13
 What we have before us cannot be twisted into a combination of small or large illegal circumstances or practices which culminated in the will of either Smith or Stanford being overborne at the time they confessed. As must be reasonably admitted from the above, these defendants cannot be cloaked with the tender immaturity protection of Haley and Gallegos. They were never expressly or impliedly threatened with continued incommunicado detentions and induced to make and sign their statements by the promise of communication with and access to family nor is there a scintilla of undisputed evidence of any inducement or promise whatsoever. Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (May 27, 1963). The record is barren of alleged use of drugs by the defendants. The record is equally barren of contention that either Smith or Stanford is an inadequate individual, psychologically defective or the like. There is no evidence that the necessary interrogation was at all exhausting. While various law enforcement officers were at the questioning, no valid suggestion is indicated of relays of interrogators in some sort of a battering effort to force confessions. Nor is there acceptable evidence of request to see an attorney or other person by the defendants. What happened in this instance and from the full record is that these defendants on authentic information were arrested as prime suspects in the wanton killing of the deceased. They attempted alibis which were promptly investigated and found false. That took some time but within a fairly short period, the alibis having been demonstrated to be untrue, and confronted with the damning revelation of their talk with Parker the morning after the murder, the defendants, Stanford first, minimizing his part, followed by Smith, told substantially of their fatal mugging of Mr. Dellorto on the night of June 13, 1958.
 
 
 14
 The record here simply must be faced up to and in accordance with the Supreme Court's mandate, this case judged on its own facts. "In resolving the issue all the circumstances attendent upon the confession must be taken into account." (Emphasis supplied). Reck v. Pate, 367 U.S. 433, 440, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961). Where the evidence is disputed the findings of the state court are conclusive. Culombe v. Connecticut, 367 U.S. 568, 603-604, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). The findings of fact by the New Jersey Supreme Court above quoted are not questioned, they cannot be. Even if they were, they are fully grounded in trial evidence. Under all the circumstances the trial transcript cannot be validly proclaimed to reveal undisputed evidence that suggests force or coercion and so calls for reversal. This is the explicit doctrine of the Haley opinion, supra.
 
 
 15
 Having ascertained that the facts outlined by the state court are authentic; that they justify the holding that the confessions were not coerced, then the least we should do is to so state in no uncertain terms. In this instance we have before us the decision of a state tribunal which understood its duty and complied with it. Under the facts and law, in good conscience we cannot disturb that judgment. No one in these United States need remain unjustly convicted of a crime where his coerced confession is in evidence. But in this rightful proceeding, unwarranted fear of ruling where the facts and law demand it would bring about the very miscarriage of justice this court is determined to avoid. And reversal of these convictions would be a signal to the vicious elements rampant in our cities that the chances are excellent for eventually slipping out from under responsibility lawfully established for crimes which stagger belief.
 
 
 16
 The order of the district court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 United States ex rel. Smith v. State of New Jersey, 194 F.Supp. 691 (D.N.J. 1961)
 
 
 [2]
 State v. Smith, 32 N.J. 501, 510, 161 A. 2d 520, 524 (1960)
 
 
 [3]
 State v. Smith, supra, 32 N.J. pp. 531, 532, 161 A.2d pp. 535, 536
 
 
 [4]
 State v. Smith, supra, 32 N.J. pp. 535-539, 161 A.2d pp. 538-540
 
 
 [5]
 State v. Smith, supra, 32 N.J. p. 516, 161 A.2d p. 527
 
 
 [6]
 State v. Smith, supra, 32 N.J. p. 557, 161 A.2d p. 550
 The Supreme Court had this further significant comment concerning defendants' records 32 N.J. at page 538, 161 A. 2d p. 539: "However, particularly since Stanford later filed an affidavit, supplementing the record on the motion to dismiss the indictment, in which he stated he had only been before the juvenile court on one prior occasion, we have examined all original records of the court relating to both defendants and are convinced thereby that they were unquestionably habitual offenders, and that with respect to serious offenses."
 
 
 [7]
 State v. Smith, supra, 32 N.J. p. 551, 161 A.2d p. 547
 
 
 [8]
 State v. Smith, supra, 32 N.J. p. 551, 161 A.2d p. 547
 
 
 
 17
 BIGGS, Chief Judge (dissenting).
 
 
 18
 On June 13, 1958, at approximately midnight, Carmine Dellorto, aged 66, was robbed and killed on a street corner in Newark, New Jersey. Ten days later, on June 23, 1958, Clarence Smith and Lee Stanford, the relators in the cases at bar, were arrested by the Newark police and brought directly to the "Homicide Squad" room at police headquarters in Newark, arriving there at about four o'clock in the afternoon. Both Smith and Stanford were minors, 17 years of age and Negroes. No warrant had been issued for their arrests. They were separated upon their arrival at police headquarters. Stanford was taken to a section of the homicide room and questioned. Smith was placed in a small room located a few feet away from the homicide room for interrogation. Five police officers were present upon the relators' arrival. Later, two detectives from the Prosecutor's Office arrived and joined in the questioning. Details of the interrogation of the relators are set out hereinafter. They signed typed statements, in substance confessions of the robbery and killing of Dellorto. At about 2 A.M. Smith and Stanford were taken from police headquarters to the Essex County Youth House in Newark.
 
 
 19
 Within twelve hours after their arrival at the Youth House on the morning of June 24, 1958, both Smith and Stanford reported to the case worker supervisor, Siegler, that they had been beaten by the police in order to procure their confessions. Medical examinations given to the relators on the day they arrived at the Youth House failed, however, to reveal any noticeable injuries. Nonetheless, during the first few days of their stay at Youth House, both relators were treated at the infirmary: Smith for a sore knee and a cut fingernail, and Stanford for general bodily soreness and a cut lip.[1] While detained at Youth House, both Smith and Stanford were permitted to have visitors, and in fact both were visited by members of their families and by an attorney. On June 27, 1958, four days after their arrests, complaints were filed against both relators in Juvenile Court. They were charged with murder in the first degree.
 
 
 20
 On July 3, 1958, ten days after the arrests, a hearing was held before a Judge of the Essex County Juvenile Court. Both minors were represented by counsel. The complaints simply were read out in open court and the Judge ordered the case transferred to the Prosecutor's Office in order that the relators could be treated as if adult offenders. Smith and Stanford were then taken to the Newark Street jail where they remained until trial.
 
 
 21
 On September 16, 1958, the grand jury of Essex County returned indictments charging Smith and Stanford with murder in the first degree. The relators moved to dismiss the indictments on the grounds that the juvenile detention rules and statutes of New Jersey had been violated in that they had been detained at police headquarters instead of being brought directly to the Youth House, that they had not been taken promptly before a magistrate or a juvenile court officer, that no preliminary hearing had been afforded them on the issue of probable cause, and that their confessions had been obtained illegally. The motion was denied. 52 N.J.Super. 556, 146 A.2d 224 (1958).
 
 
 22
 Smith and Stanford were brought to trial on January 21, 1959, in Essex County Court before Judge Joseph G. Lyons and a jury. Witnesses called by the prosecution were able to testify only that two Negro boys had been in the vicinity of the killing, that "two persons" were seen "leaning over another person" who was "on the ground" and that "two boys" had been observed fleeing the scene of the crime. One witness stated that one of the Negro youths was tall and thin, the other short and stocky. As general descriptions the words employed might cover Smith and Stanford. None of the witnesses, however, was able to identify the relators as the "two boys" referred to as fleeing the scene of the crime. Both relators testified that they had been in their homes at the time the killing took place. It is apparent that much of the weight of the State's case lay in the confessions and that without them the jury might well have decided that there was insufficient evidence to convict the relators.
 
 
 23
 Prior to the admission into evidence of the confessions, the trial court conducted an inquiry into the circumstances under which they were given. Smith and Stanford testified respecting these circumstances as did the police officers involved, several persons from the Youth House staff, and other persons. There were substantial differences in the evidence adduced. Both Smith and Stanford asserted that they had been beaten by the police during their interrogation and had been directed by police officers to sign papers which, said the relators, had been represented to them as necessary for their admissions to Youth House. These signed statements, according to the relators, were in fact the confessions. The police officers, without exception, testified that no force or threats of force had been used in order to obtain the confessions and that the relators voluntarily made oral admissions early in the evening of June 23 and had signed the subsequently prepared typed statements with full knowledge of their contents and their effect. The trial court concluded that the confessions were voluntary and admissible and the jury subsequently returned verdicts of guilty of murder in the first degree as to both relators with recommendations for life sentences. Judgments in accordance with the verdicts were rendered as to both relators and were affirmed on appeal to the Supreme Court of New Jersey.[2] Certiorari was denied by the United States Supreme Court.[3] The petition for writ of habeas corpus was subsequently presented to the United States District Court for the District of New Jersey. A hearing on this petition was held on March 20, 1961. Oral argument was heard but no testimony was offered or taken. Judgment was rendered and the petition for habeas corpus was denied.[4] The appeals at bar followed.[5]
 
 
 24
 The issue which was before the court below and is now before us is whether the confessions of Smith and Stanford, admitted in evidence at their trial, were obtained in such a manner as to violate the guarantee of due process of law of the Fourteenth Amendment. It is axiomatic that "[t]he Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession." Ashcraft v. Tennessee, 322 U.S. 143, 155, 64 S.Ct. 921, 927, 88 L.Ed. 1192 (1944). See Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). A coerced confession is barred whether obtained by physical or mental pressure. Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954). In Reck v. Pate, 367 U.S. 433, 440, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961), it was said: "[I]t is hardly necessary to state that the question whether a confession was extracted by coercion does not depend simply upon whether the police resorted to the crude tactic of deliberate physical abuse."
 
 
 25
 Some of the testimony concerning the details of the interrogations of Smith and Stanford "follows the usual pattern and is in hopeless conflict." Ashcraft v. Tennessee, 322 U.S. 143, 150, 64 S.Ct. 921, 924, 88 L.Ed. 1192 (1944). The claims of brutality and mistreatment on the one hand and the avowed denials by the police on the other present issues of credibility that cannot be resolved here. Accordingly the conflicting testimony will be set to one side and only the undisputed evidence will be considered. See Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Malinski v. People of State of New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940).
 
 
 26
 The necessity for maintaining a proper balance, necessarily a delicate one, between federal and state authority must be kept in mind where, as here, a federal court sits in review of a matter decided by the highest court of a state. Nonetheless, "where the claim is that the prisoner's statement has been procured by [coercion], we are bound to make an independent examination of the record to determine the validity of the claim. The performance of this duty cannot be foreclosed by the finding of a court, or the verdict of a jury, or both." Lisenba v. People of State of California, 314 U.S. 219, 237-238, 62 S.Ct. 280, 290-291, 86 L.Ed. 166 (1941). See Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L. Ed.2d 513 (1963): "[W]e cannot avoid our responsibilities by permitting ourselves to be `completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding.' Stein v. People of State of New York, 346 U.S. 156, 181 [73 S.Ct. 1077, 97 L.Ed. 1522]."[6]
 
 
 27
 The following testimony is undisputed. Smith and Stanford were held in the police station from approximately 4:00 P.M. until 2:00 A.M. the following morning — a period of nearly ten hours. The two relators, Negro minors, 17 years of age, were questioned separately, one apart from the other in separate rooms by five, then later seven, officers in relays of three or four. No attempt was made to inform the relators of their right to remain silent or of their right to counsel, and they were held incommunicado throughout the entire time they remained at police headquarters. The statements of confession were typed by the officers, in contradistinction to a stenographic transcript of oral admission, and were signed by Smith and Stanford at 1:27 A.M. and 1:24 A.M., respectively. One may question, in view of the very late or very early hour at which the confessions were signed and in the light of their comparative brevity, whether the oral statements upon which the written confessions were allegedly based, were obtained in the manner and at the times testified to by the State's witnesses.[7]
 
 
 28
 In the light of the "complex of circumstances," Harris v. South Carolina, 338 U.S. 68, 71, 69 S.Ct. 1354, 1356, 93 L.Ed. 1815 (1949), from the undisputed testimony, "[t]he question [to be decided] in each case is whether a defendant's will was overborne at the time he confessed." Reck v. Pate, supra, 367 U.S. p. 440, 81 S.Ct. p. 1546, 6 L.Ed.2d 948. The test of whether a confession was coerced in violation of the Fourteenth Amendment is whether or not it was a voluntary one.[8] If voluntary the confession may be employed as evidence against the defendant; otherwise, it may not be so used.
 
 
 29
 A finding of lack of due process of law may or may not be based on any single element standing alone in a "complex of circumstances." But a combination of several elements, each of which if standing alone might not constitute a violation of the guarantees of the Fourteenth Amendment, may do so in the aggregate if the totality presents a situation inconsistent with an exercise of free will by the individual making the confession.
 
 
 30
 Interrogation of a suspect held incommunicado by the police which results in a confession does not necessarily in and of itself constitute a denial of due process. Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958). The Constitution does not always require that the interests of the police in quickly and efficiently solving crimes yield to the needs of a suspect to have consultation made available to him during a period of questioning. Cicenia v. Lagay, 357 U.S. 504, 509, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958). But when closed and secret interrogation of a suspect is prolonged beyond what may be deemed to be a reasonable period of time, the dividing line between police behavior permitted by the Constitution and that prohibited by it is closely pressed if not passed. In Culombe v. Connecticut, 367 U.S. 568, 573-576, 81 S.Ct. 1860, 1862-1865, 6 L.Ed.2d 1037 (1961), Mr. Justice Frankfurter stated: "This practice has its manifest evils and dangers. Persons subjected to it are torn from the reliances of their daily existence and held at the mercy of those whose job it is — if such persons have committed crimes, as it is supposed they have — to prosecute them. They are deprived of freedom without a proper judicial tribunal having found them guilty, without a proper judicial tribunal having found even that there is probable cause to believe that they may be guilty. What actually happens to them behind the closed door of the interrogation room is difficult if not impossible to ascertain. Certainly, if through excess of zeal or aggressive impatience or flaring up of temper in the face of obstinate silence a prisoner is abused, he is faced with the task of overcoming, by his lone testimony, solemn official denials. The prisoner knows this — knows that no friendly or disinterested witness is present — and the knowledge may itself induce fear. But, in any case, the risk is great that the police will accomplish behind their closed door precisely what the demands of our legal order forbid: make a suspect the unwilling collaborator in establishing his guilt. This they may accomplish not only with ropes and a rubber hose, not only by relay questioning persistently, insistently subjugating a tired mind, but by subtler devices.
 
 
 31
 "In the police station a prisoner is surrounded by known hostile forces. He is disoriented from the world he knows and in which he finds support. He is subject to coercing impingements, * * of every variety. In such an atmosphere, questioning that is long continued — even if it is only repeated at intervals, never protracted to the point of physical exhaustion — inevitably suggests that the questioner has a right to, and expects, an answer. This is so, certainly, when the prisoner has never been told that he need not answer and when, because his commitment to custody seems to be at the will of his questioners, he has every reason to believe that he will be held and interrogated until he speaks."
 
 
 32
 A nine and one-half hour to ten hour period of persistent interrogation during which a suspect is held incommunicado might or might not prove to be overbearing where an adult is involved. But in the appeal at bar this court is dealing with the emotional stability and maturity, or lack thereof, of 17 year old minors. The tension and fears pressing down on the mind of a suspect as the result of prolonged and secret police interrogation must be deemed to be multiplied when the prisoner is an adolescent. In Gallegos v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212-1213, 8 L.Ed.2d 325 (1962), Mr. Justice Douglas said: "[W]e deal with a person [a prisoner] who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights. * * He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights — from someone concerned with securing him those rights — and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself."
 
 
 33
 Judgment of the issue at bar involves more than a mere matching of cases. See Reck v. Pate, supra. But it is appropriate to compare the circumstances of the case now before us and those of Haley v. Ohio, supra.
 
 
 34
 In Haley, the Supreme Court, considering only the undisputed testimony, had before it the following facts. The defendant, a 15 year old Negro youth, was questioned by the police for a period of about five hours, from midnight to five o'clock in the morning. Five or six officers conducted the interrogation in relays of one or two each. During this time he was held incommunicado. At about five in the morning the youth confessed. The confession was typed by the police and signed by the prisoner. At no time prior to the signing of the confession had he been advised of his right to remain silent or of his right to counsel. The typed statement, however, contained a clause to the effect that Haley understood his right to remain silent and that the confession had been given of his own free will.
 
 
 35
 The Supreme Court held that the confession had been coerced, rejecting the "voluntary" clause in the typed statement. Mr. Justice Douglas, speaking for the majority, id. supra, 332 U.S. pp. 599-601, 68 S.Ct. pp. 303-305, 92 L.Ed. 224, stated: "What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child — an easy victim of the law — is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a. m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him. * * *
 
 
 36
 "The age of the petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction."
 
 
 37
 In Townsend v. Burke, 334 U.S. 736, 738, 68 S.Ct. 1252, 1254, 92 L.Ed. 1690 (1948), Mr. Justice Jackson stated that the Court in the Haley case reversed the state court criminal conviction "because it was believed to have been based on a confession wrung from an uncounseled 15-year-old boy held incommunicado during questioning by relays of police for several hours late at night." In the appeals at bar, as has been said, the confessions were obtained from two seventeen year old boys held incommunicado during interrogation by relays of police officers for a period of approximately nine and one-half hours to ten hours, lasting until two o'clock in the morning. The difference between Haley and the defendants in the instant case cannot properly be called "abysmal" as the majority has characterized it.
 
 
 38
 The conclusion is inescapable that the confession of Smith and Stanford so obtained violated "those fundamental notions of fairness and justice in the determination of guilt or innocence which lie embedded in the feelings of the American people and are enshrined in the Due Process Clause of the Fourteenth Amendment." Haley v. Ohio, supra, 332 U.S. at p. 607, 68 S.Ct. at p. 307, 92 L.Ed. 224. See the concurring opinion of Mr. Justice Frankfurter.[9]
 
 
 39
 The Juvenile Court records of Smith and Stanford cannot be considered as weighing too heavily against all the other potent factors considered here.[10] The processes of interrogation employed by the police in the light of all the circumstances were of such a nature that records of the relators as juvenile delinquents for misdemeanors or crimes unspecified in the record in this case cannot be deemed to compensate for Smith's and Stanford's lack of years and worldly knowledge.[11]
 
 
 40
 In Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513, (1963), the Supreme Court had occasion to consider two factors present or allegedly present in the case at bar; that the petitioner had previous experience with police investigation, and that he had made oral admissions of guilt at some time prior to the taking of the written statement he asserted was forced from him. The Court stated: "Here, as in [Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963)], the petitioner was alone in the hands of the police, with no one to advise or aid him, and he had `no reason not to believe that the police had ample power to carry out their threats,' 372 U.S., at 534 [83 S.Ct. at 920, 9 L.Ed. 2d 922] to continue, for a much longer period if need be, the incommunicado detention * * *. Neither the petitioner's prior contacts with the authorities nor the fact that he previously had made incriminating oral admissions negative the existence and effectiveness of the coercive tactics * * *." The Court stated further, 373 U.S. at 514, 83 S.Ct. at 1343, 10 L.Ed.2d 513, "We cannot blind ourselves to what experience unmistakably teaches: that even apart from the express threat, the basic techniques present here — the secret and incommunicado detention and interrogation — are devices adapted and used to extort confessions from suspects."
 
 
 41
 The majority opinion states that "reversal of these convictions would be a signal to the vicious elements rampant in our cities that the chances are excellent for eventually slipping out from under responsibility lawfully established for crimes which stagger belief." This declamation begs the question, for the phrase "lawfully established" means guilt proven beyond a reasonable doubt by competent evidence, or if by confession, by confession given freely and voluntarily, with full understanding of the consequences. The brutality of the crime or the fact that the defendant may be part of a "vicious" element of society is and must be deemed to be totally irrelevant to the determination of an issue such as that at bar. Strict adherence to the procedural safeguards established as a result of years of experience in judicial administration of criminal justice is paramount in importance to individual convictions. "* * * [I]t is the deprivation of the protected rights themselves which is fundamental and the most regrettable, not only because of the effect on the individual defendant, but because of the effect on our system of law and justice. Whether there is involved the brutal `third degree,' or the more subtle, but no less offensive, methods * * *, official misconduct cannot but breed disrespect for law, as well as those charged with its enforcement", Haynes v. Washington, supra, 373 U.S. at 519, 83 S.Ct. at 1346, 10 L.Ed.2d 513.
 
 
 42
 The doctrine of former jeopardy obtains in New Jersey only where there has been an acquittal. State v. Williams, 30 N.J. 105, 152 A.2d 9 (1959); State v. Edelman, 26 N.J.Super. 588, 98 A.2d 618 (1953). Smith and Stanford could therefore be retried by the State of New Jersey were the writs granted in the case at bar, and their guilt or innocence determined properly and fairly. Thus the majority's concern that the defendants might otherwise have a chance of "slipping out from under responsibility lawfully established", assuming arguendo that such concern is proper in a case of this nature, is unfounded.
 
 
 43
 Accordingly, I must respectfully dissent from the decision reached by the majority for I am of the opinion that the writs should be granted.
 
 
 44
 GANEY, Circuit Judge, joins in this dissent.
 
 
 
 Notes:
 
 
 [1]
 The uncontested infirmary records of the Youth House showed that both Smith and Stanford had been treated for minor cuts and bruises. This fact might or might not tend to support their allegation of physical brutality on the part of the police but, as appears from the body of this opinion, expressly we do not consider this line of evidence. It is to be noted, however, that coercion cannot be measured by cuts or bruises; "[T]he blood of the accused is not the only hallmark of an unconstitutional inquisition." Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960)
 
 
 [2]
 32 N.J. 501, 161 A.2d 520 (1960). In particular as to the admission of the confessions of Stanford and Smith, see 32 N.J. 501, at p. 539, 161 A.2d 546, at p. 540. Cf. State v. Fauntleroy, 36 N.J. 379, 395-398, 177 A.2d 762, 770-772 (1962)
 
 
 [3]
 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961)
 
 
 [4]
 194 F.Supp. 691 (D.N.J.1961)
 
 
 [5]
 Smith and Stanford have exhausted their state remedies. See Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950)
 
 
 [6]
 See also Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); Malinski v. People of State of New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944)
 
 
 [7]
 The record in this case is a confused one and many critical times are in doubt, but the times at which the confessions read into evidence were signed are not in doubt. They are written on the confessions themselves and cannot be disputed
 
 
 [8]
 "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.", Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L. Ed.2d 1037 (1961) (by Frankfurter, J.). "A confession * * * must be the expression of free choice. A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary." Watts v. Indiana, 338 U.S. 49, 53, 69 S. Ct. 1347, 1350, 93 L.Ed. 1801 (1949)
 
 
 [9]
 Evidence of guilt apart from the confessions is actually an irrelevant factor, for if the confessions were obtained in such a manner as to violate the Fourteenth Amendment the conviction cannot stand even if "the evidence apart from the confession might have been sufficient to sustain the jury's verdict." Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Malinski v. People of State of New York, 324 U.S. 401, 404, 65 S.Ct. 781, 89 L.Ed. 1029 (1945). See Payne v. Arkansas, 356 U. S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949)
 
 
 [10]
 The Judge of the Juvenile Court in an affidavit in the record states that both Smith and Stanford were habitual offenders. An affidavit, executed by Stanford, also part of the record, alleges that he was before the Juvenile Court only once, when he was fifteen years old
 
 
 [11]
 In Haley v. Ohio, 332 U.S. 596, 68 S. Ct. 302, 92 L.Ed. 224 (1948), the issue of whether or not the relator had been in trouble with the law is not mentioned though this fact is brought out in Mr. Justice Clark's dissenting opinion in Gallegos v. Colorado, 370 U.S. 49, 63, 82 S. Ct. 1209, 8 L.Ed.2d 325 (1962), as applicable to the fifteen year old relator in Haley v. Ohio. The majority opinion, however, in Gallegos v. Colorado makes no mention of a factor of previous convictions for crimes or misdemeanors of the relator if any existed