UNITED STATES of America ex rel.
Miguel CASTRO, Petitioner,

v.

J. Edwin LaVALLEE, Warden, Auburn
State Prison, Auburn, N. Y.,
Respondent.

No. 67 Civ. 2096.

United States District Court
S. D. New York.

March 20, 1968.

William P. Callahan, New York City, for petitioner; Robert J. Riordan, Joseph V. Kline, New York City, of Counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, for respondent, by Joel H. Sachs, Asst. Atty. Gen., New York City.

Frank J. Hogan, Dist. Atty. of New York County, by Edward R. Hammock, Asst. Dist. Atty., New York City.

MANSFIELD, District Judge.

On the hot summer evening of August 23, 1959, teenage gang warfare broke out in New York City's lower East Side, resulting in the homicide by shooting of one Theresa Gee and several felonious assaults, including the stabbing of one Julio Rosario in Forsyth Park. A group of youthful suspects were rounded up by New York City police and held in the second floor squad room of the 9th Precinct, East 5th Street, for questioning. As part of the round-up New York City Patrolman Okpych, at approximately 11:00 P.M. that evening, went to the home of petitioner, Miguel Castro, a 17-year old Puerto Rican youth of "dull, normal" intelligence (full scale IQ of 83), who lived with his mother at 117 East 2nd Street, about three blocks away from the station house, took petitioner into custody and brought him to the station house. There he was first placed in the squad room with other suspects and then transferred to a smaller side room, where he was kept incommunicado and under guard by at least one policeman for the next 10 to 11 hours, without food, water, sleep or independent counsel. Here he was intermittently interrogated, without any warning or advice as to any of his Constitutional rights, by various police officers until at approximately 11:15 A.M. the next day, August 24, 1959, he gave a statement to a New York County Assistant District Attorney, recorded in question and answer form, admitting the stabbing of Julio Rosario. Thereupon he was placed under arrest, arraigned before a magistrate, and committed to jail.

Following Rosario's death on August 25, 1959, petitioner was indicted for first degree murder, tried before a jury which found him guilty on June 22, 1960, after which he was sentenced to a term of 25 years to life, now being served by him in Auburn State Prison, Auburn, New York. At petitioner's trial an im-

portant piece of incriminating evidence against him was his 18-page formal "question and answer" statement, which was admitted into evidence by the Court over his counsel's objection that it was involuntary and coerced, following which his counsel also unsuccessfully moved to have it stricken and for an instruction to the jury that it be disregarded.

Petitioner appealed his conviction. While his appeal was pending, the United States Supreme Court handed down its historic decision in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), to the effect that a trial court must hold a preliminary hearing on the issue of voluntariness and permit a confession to go to the jury only after independently determining that it is voluntary. This decision being retroactive, see Johnson v. State of New Jersey, 384 U.S. 719 at 727, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the New York Court of Appeals in People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), held that as to trials already concluded a Jackson-type preliminary hearing would be accorded except "where a confession was admitted without any objection by the defendant or any assertion by him or his witnesses as to voluntariness".

While his appeal was pending, petitioner moved unsuccessfully for a remand of his case to the trial court for a preliminary hearing on voluntariness. On March 22, 1966, the Appellate Division affirmed the conviction, People v. Castro, 25 A.D.2d 718, 269 N.Y.S.2d 371 (1966). Upon further appeal the Court of Appeals, affirming the conviction, refused a remand for a Jackson-Huntley type preliminary hearing, holding that petitioner's right to such a hearing had been waived by the fact that although his counsel had made timely objections to the introduction of the confession as involuntary and coerced and had unsuccessfully moved to strike it and for an instruction to the jury to disregard it, he had failed, at the conclusion of the trial, to request a charge to the jury (pursuant to § 395 of the New York Code of Criminal Procedure) on the issue of voluntariness and, after the trial judge commented that he saw no bona fide issue of voluntariness, had stated that petitioner did not contend the statements to be involuntary. 19 N.Y.2d 14, 227 N.Y.S.2d 644, 224 N.E. 2d 80 (1966), certiorari was denied by the United States Supreme Court, 387 U.S. 914, 87 S.Ct. 1702, 18 L.Ed.2d 638 (1967).

On May 29, 1967, petitioner filed his petition here for a writ of habeas corpus, following which this Court, in an opinion filed on October 3, 1967, held (1) that petitioner had not waived or deliberately by-passed a federal right retroactively available to him under Jackson v. Denno, since he had made timely objections to the introduction of the statement at his trial, contending that it was involuntary and coerced, and (2) that his counsel's failure to insist upon a charge to the jury under Criminal Code § 395 did not constitute side-stepping of state procedures, since by that stage of trial the confession had already been admitted over objection and was before the jury so that such a charge would not have enabled the trial judge to accord to petitioner his retroactive right to a preliminary Jackson-Huntley type hearing, in which he might testify before the Court alone on the issue of voluntariness without waiving his privilege against self-incrimination, Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (Decided 3/18/68), which would permit him to prove to the trial judge that voluntariness had not been shown and that the confession should not go to the jury. Without having the benefit of such testimony, the trial judge stated that he saw no bona fide issue of voluntariness and hence notwithstanding earlier timely objections was unwilling to withdraw the confession from the jury.

Having concluded that petitioner did not waive his right to a preliminary hearing to determine whether his statement should be withheld from the jury on the ground that the State had not

established that it was voluntary, this Court could have directed that such a hearing be held by the state court, see Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967); Stevenson v. Boles, 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964); Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); United States ex rel. Gomino v. Maroney, 231 F.Supp. 154 (W.D.Pa.1964), or could itself have held a plenary hearing to resolve the issue, a procedure sanctioned under certain circumstances. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Ledbetter v. Warden, 368 F.2d 490 (4th Cir. 1966), cert. denied, 386 U.S. 971, 87 S.Ct. 1162, 18 L.Ed.2d 130 (1967); see United States ex rel. Carafas v. LaVallee, 334 F.2d 331, 334 (2d Cir. 1964). *Townsend, Ledbetter* and *Carafas* presented situations in which the trial had taken place substantial periods prior to the habeas petition (eight years, six years and four years, respectively) so that it was not likely that the matter would have been very fresh in the mind of the trial court. Moreover, the latter two cases presented occasions on which state law clearly indicated that petitioner could not obtain further redress of his claims because he had violated a procedural rule.

■ While the line between those cases remanded to the state courts for a hearing and those in which the hearing has been held in the federal court is not crystal clear, the Supreme Court has indicated, Henry v. State of Mississippi, 379 U.S. 443, 452, 85 S.Ct. 564, 13 L.Ed. 2d 408 (1965), that when a federal court concludes that a state procedural rule precludes a hearing to determine a constitutional claim and the state court has indicated unwillingness to make such a determination in violation of its rule, the federal courts, in the interest of harmonious federal-state relations, should hold the hearing rather than put pressure upon the state court to take action that is procedurally distasteful to it. Moreover, the habeas petitioner's interest in not having to face the monstrous procedural maze involved in repetitious shuttling between state and federal forums in order to secure his constitutional guarantees is an appropriate consideration. See Roberts v. La-Vallee, 389 U.S. 40, 42, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967).

■ Castro was tried nearly eight years ago. His right to a Jackson-Huntley type preliminary hearing has been repeatedly denied by the New York state courts on the ground that his appointed counsel's statement to the trial judge declining to submit the voluntariness issue to the jury constituted a waiver, despite Castro's having objected to the introduction of the statements and his having moved to strike the statements following their admission into evidence. The New York courts' resolution of the waiver issue was not only inconsistent with federal standards, but was contrary to the test laid down in *Huntley* because Castro had objected to the admission of his confession. Under these circumstances, and without any desire to preempt the functions and criminal procedures established by the New York state courts, for which this Court has profound respect, this Court reluctantly concluded that since the state courts, after full review, had in effect established a procedure which denied Castro the preliminary hearing mandated by the United States Constitution in this case, the voluntariness issue was an appropriate one for resolution by this Court. To this end, the Court held a full and plenary hearing on the voluntariness issue.

A threshold question is the burden of proof as to voluntariness. In 1966 Congress amended the habeas procedure to provide:

"And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, *unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise*

*appears, or is admitted by the respondent,* or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, *the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.*" (Emphasis supplied) (28 U.S.C.A. § 2254(d))

Subparagraphs (2), (6) and (7) provide as follows:

"(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

\*      \*      \*      \*      \*      \*

"(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

"(7) that the applicant was otherwise denied due process of law in the State court proceeding".

■ Castro argues that because he was unable to attack the voluntariness issue in accordance with the standards set forth in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), without waiving his Fifth Amendment self-incrimination rights "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing." See Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (Decided 3/18/68). In the alternative, to the extent that the procedure at the state trial was different from that outlined in *Jackson,* Castro has been "otherwise denied due process of law in the State court proceeding." As the Supreme Court said in *Jackson,* 378 U.S. at 376–77, 84 S.Ct. at 1780–1781:

"Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a deter-

mination uninfluenced by the truth or falsity of the confession. Rogers v. Richmond, supra, [365 U.S. 534, 5 L.Ed.2d 760]. In our view, the New York procedure employed in this case did not afford a reliable determination of the voluntariness of the confession offered in evidence at the trial, did not adequately protect Jackson's right to be free of a conviction based upon a coerced confession and therefore cannot withstand constitutional attack under the Due Process Clause of the Fourteenth Amendment."

■ Since the trial procedure that Castro faced was identical with that in *Jackson,* Castro clearly falls within either categories (2) and (6), or else (7), so that the burden of proof at the voluntariness hearing could not have been upon Castro to establish his case "by convincing evidence".

■ Under these conditions, the burden of proof shifts from Castro to the State, United States ex rel. Thurmond v. Mancusi, 275 F.Supp. 508, 520 (E.D. N.Y.1965) (Weinstein, J.), although the applicable quantum is unclear. Recent Circuit Court decisions in federal criminal cases have split on the question whether, as a matter of constitutional law, the Government must prove voluntariness beyond a reasonable doubt at the preliminary hearing. Compare United States v. Inman, 352 F.2d 954, 956 (4th Cir. 1965), and Clifton v. United States, 125 U.S.App.D.C. 257, 371 F.2d 354, 362–363 (1966) (concurring opinion), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967), with Clifton v. United States, 125 U.S.App. D.C. 257, 371 F.2d 354, 358–360 (1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1965). The New York state courts, as a matter of state procedural law, have adopted the reasonable doubt standard as the applicable test at the preliminary hearing. People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965); Note, Developments in the Law—Confessions, 79 Harv.L.Rev. 938, 1070 n. 69 (1966). Fairness and logic dictate that Castro,

having been deprived of a hearing consistent with Due Process requirements at trial, should be no worse off at a federal hearing than he would have been had the case been remanded to the state courts for a *Huntley* hearing. Thus, reason points in the direction of imposing the burden of proof upon the State to show beyond a reasonable doubt that Castro's confession was voluntary. However, since the Court would arrive at its result even if the burden upon the State were merely to show voluntariness by a preponderance of the evidence, it becomes unnecessary to rest the decision on a reasonable doubt test.

■ After a thorough review and appraisal of the evidence presented at the hearing, including testimony of Castro and eight other witnesses, and the transcript of his state court trial, the Court concludes that the State of New York has failed to establish by a fair preponderance of the evidence that the incriminating statement obtained by it from Castro on the morning of August 24, 1959, was voluntarily given by him; and that the statement should not have been admitted into evidence at the state court trial on the charge of first degree murder against him. In reaching this conclusion the Court has applied the principles enunciated in numerous Supreme Court decisions to the effect that the test of voluntariness is not whether the confession is truthful but whether it is the product of a deliberate, sentient, and free choice, i. e., a rational intellect and a free will, not the result of duress or coercion, whether physical or psychological. See Note, Developments in the Law—Confessions, 79 Harv.L.Rev. 938, 973–74 (1966). In order to resolve this issue the Court must consider and weigh the totality of surrounding circumstances, including the accused's age; his physical condition, education and mental capacity, background and experience; the time of day, duration and type of the interrogation to which he was subject; and the extent to which he was aware of his Constitutional rights and had access to friends, relatives or independent counsel. Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936).

■ Use of physical force, or of threats of such force, need not be shown in order to invalidate a confession as involuntary. A showing that psychological compulsion or pressure was used, particularly where the suspect is a callow youth, is sufficient. Gallegos v. State of Colorado, supra; Haley v. State of Ohio, supra. The type of psychological pressure that is barred was described by Chief Justice Warren in Spano v. People of State of New York, 360 U.S. 315, 322, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959):

"He did not make a narrative statement, but was subject to the leading questions of a skillful prosecutor in a question and answer confession. He was subjected to questioning not by a few men, but by many * * * [T]he effect of such massive official interrogation must have been felt. Petitioner was questioned for virtually eight straight hours before he confessed * * *. Nor was the questioning conducted during normal business hours, but began in early evening, continued into the night, and did not bear fruition until the not-too-early morning. The drama was not played out, with the final admissions obtained, until almost sunrise. In such circumstances slowly mounting fatigue does, and is calculated to, play its

part." (at p. 322, 79 S.Ct. at p. 1206–1207)

In this case the accused at the time of his interrogation had just turned 17 years of age. Born in Puerto Rico he had been brought by his mother to New York City at an early age and after her separation and remarriage was reared by her in an apartment on the lower East Side where he lived with her, his step-father and brothers and sisters. At the time of his arrest he had had an eighth grade education, but both his school attendance and his scholastic achievement had generally been poor, with the result that he had a third grade reading level ability, had failed several subjects, and had a limited capacity to speak English.* When Castro was examined by court-appointed psychiatrists after his arrest, he was found to possess a "dull, normal intelligence." Moreover, he "lacked intellectual resources to cope with complex situations" and had a "personality pattern disturbance." Reports submitted by the New York City Board of Education, Bellevue Hospital and Auburn State Prison show that he had IQ ratings of 79, 83 and 91. See Collins v. Beto, 348 F.2d 823, 833 (5th Cir. 1965) (Friendly, J. concurring). The petitioner's youthfulness, limited education and limited mental capacity, at a time when he faced prolonged interrogation by older, experienced and educated police officers, detectives, and assistant district attorneys, are important factors to be considered by this Court in determining whether or not his statement, which was given after more than 11 hours of intermittent questioning throughout the night, was a voluntary act on his part, or the result of mental coercion. Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); Reck v. Pate, 367 U.S. 433 (1961); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948). A confession obtained by police from a 14-year old boy immediately upon his arrest without advice of counsel or adult friends was rejected by the Supreme Court in *Gallegos* on the ground that the situation, because of the accused's age, was so inherently coercive that it was irreconcilable with possession of mental freedom. In the present case, Castro's age (17 years) and limited mental capacity, standing alone, would probably be insufficient to invalidate his confession. See United States ex rel. Smith v. State of New Jersey, 323 F.2d 146 (3d Cir. 1963) (en banc), cert. denied, 377 U.S. 1000, 84 S.Ct. 1927, 12 L.Ed.2d 1049 (1964). However, these factors must be considered along with many other circumstances which compel the conclusion that the statement was the result of excessive pressure.

Upon his arrival at the 9th Precinct Station House on the evening of August 23, 1959, in the custody of Patrolman Okpych, Castro was placed for a while with other suspects in a squad room on the second floor of the station house where they sat on the floor under guard. From a nearby room where she could not be seen, Minerva Rosario identified Castro to the police as the person who had stabbed Rosario earlier that evening in Forsyth Park. Thereupon, sometime between midnight and 2:00 A.M. on that summer night, police removed Castro to a small, unventilated room, about 8 by 12 feet in size, sat him in the only chair, and began interrogating him.

Since Castro had been identified by Minerva Rosario as the assailant, it is clear that the police interrogation was essentially incriminatory rather than merely investigatory in nature. The objective of the police was not simply to obtain information about crimes, but also to induce Castro to incriminate himself and thus clinch their case against him for felonious assault based on the

---

* Because of truancy and charges against him as a juvenile delinquent for pick-pocketing and shoplifiting, he had been committed to the New York State Warwick Reformatory for Delinquents at 13 years of age, and had been released only a couple of years before his arrest for the stabbing of Rosario in August of 1959.

eye-witness identification. See Clewis v. State of Texas, 386 U.S. 707, 711–712, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). At the same time they were interested in determining whether he had been involved in the homicide of Theresa Gee.

Led by Detective Edward McFarlane, an experienced police officer who had been a member of the New York City Police Department for more than 11 years and assigned to duties as a detective for 6 years, the police periodically questioned Castro for the next 9 or 10 hours. Sometimes the questioning was conducted by McFarlane in the presence of at least one officer. On occasion, he was assisted by Detective Alfred J. Fernen, who had been a police officer for 33 years, 30 of which had been served as a detective. Although McFarlane testified that he interrogated Castro only four times during the entire evening, he conceded that when he left the small room where the questioning took place, other officers remained in the room with Castro; that when he (McFarlane) left the room, he "assumed that they [the other officers] continued to talk to him [Castro]"; that he believed that Castro was also questioned by other detectives in his own squad or in the Homicide Squad and by inspectors or deputy inspectors; and that he "recalled two or, possibly, three other officers questioning him at one time." It is also undisputed that throughout the entire night there was always at least one police officer in the small room with Castro.

The police interrogation of Castro, although not accompanied by violence or threats of force, was aggressive, leading and compulsive in nature. Detective McFarlane characterized his own questioning as "pretty firm", conceding that he "may have" addressed Castro as "You little punk", and repeatedly testified that when he finally secured from Castro an admission to the stabbing he stopped "pushing" Castro.

At some point between 2:00 A.M. and 7:00 A.M. Castro admitted to the police officers that he had used a carpet cutter to stab a boy earlier that evening. Later he identified one of two knives shown to him by McFarlane as similar to the knife used in the stabbing, even though it was not a carpet cutter. Finally at 11:15 A.M. Castro was brought from the small room where he had been kept throughout the night to a lieutenant's room in the station house where he was confronted with Minerva Rosario (who had identified him as the assailant), Assistant District Attorneys Robert R. Reynolds and John F. Keenan, Detectives McFarlane, John J. Brennan, and Alfred J. Fernen, and Joseph Kahn, a stenographer employed by the District Attorney's office. From 11:15 A.M. to 11:45 A.M. he was interrogated by Assistant District Attorney Reynolds and admitted that he had stabbed a boy in Forsyth Park on the previous evening. The statement given by him, including the crucial admission, was recorded by the stenographer in question and answer form and was received in evidence, over the objections of his counsel, at his later state trial on a charge of first degree murder.

Having given the formal statement to the assembled police and district attorneys, Castro was placed under arrest, arraigned before a magistrate and committed.

■ In resolving the voluntariness issue, it is significant and undisputed that at no time was Castro ever advised by anyone, including the officers, detectives and assistant district attorney who interrogated him, of any of his Constitutional rights; that he was never warned by anyone that what he said might be used against him; and that at no time after leaving his mother's apartment at 11:00 P.M. on the evening of August 23d in police custody did he have the advice or assistance of any independent third party or relative. The State seeks to excuse this lack of advice and warning as to his Constitutional rights on the ground that the interrogation of Castro pre-dated the Supreme Court's decisions in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758,

12 L.Ed.2d 977 (1964), and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Although such advice and warnings, prior to *Escobedo* and *Miranda*, were not compulsory, nevertheless the failure to give them is a significant factor in determining the issue of voluntariness. As Chief Justice Warren, writing for the majority in Davis v. State of North Carolina, 384 U.S. 737, 740–741, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966), stated:

> "The review of voluntariness in cases in which the trial was held prior to our decisions in *Escobedo* and *Miranda* is not limited in any manner by these decisions. On the contrary, the fact that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda*, is a significant factor in considering the voluntariness of statements later made. This factor has been recognized in several of our prior decisions dealing with standards of voluntariness."

It is also significant that prior to *Miranda* and *Escobedo* most New York County assistant district attorneys, apparently recognizing the fundamental unfairness in failure to give such a warning, cautioned suspects as to their Fifth Amendment Constitutional rights before interrogating them. In response to a question put by the Court, Assistant District Attorney Keenan testified:

"Q. Before the Miranda decision and Escobedo, what was the practice with respect to giving suspect any warning at all before he was interrogated?

"A. Most of the assistants, your Honor—and I asked to see this statement because I knew it was one that Mr. Reynolds had taken —most of the assistants advised the defendants * * * that they had a right to remain silent * * * Mr. Reynolds very frequently did not give the caution concerning silence and the fact that the answers might be given in evidence. Very frequently he did not."

In the present case, taking into consideration Castro's relatively tender age, his limited education and mental capacity, and the fact that he was being interrogated by a battery of mature and experienced police officials seeking to induce him to incriminate himself, their failure to give him any warning whatsoever with respect to any of his Constitutional rights is entitled to great weight in resolving the issue of voluntariness. In an effort to mitigate such failure, the State contends that if Castro had requested the presence of his mother or sister, they would have been permitted to attend the interrogation, and points to evidence that parents and friends of other suspects were permitted to enter the station house during the night. Castro testified, however, that his requests were denied and he was corroborated by testimony of his mother and sister to the effect that they were unable to see him when they went to the station house where he was being interrogated. Regardless whether their testimony is accepted as credible, the undisputed fact remains that he never had the benefit of the presence or advice of counsel or of an adult friend or relative. Confronted as he was with a group of mature police officials seeking to extract an incriminating statement from him, the mere fact that Castro was unsophisticated and unaware of his rights does not provide a basis for penalizing him. Nor does it nullify the coercive situation and the failure of the police to furnish Castro with the information that was essential if he was to exercise his Constitutional rights intelligently. Gallegos v. State of Colorado, 370 U.S. 49, 54–55, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); Collins v. Beto, 348 F.2d 823, 830 (5th Cir. 1965).

In a further effort to minimize the effect of the absence of any adult friend, relative or counsel at Castro's interrogation, the State points to the fact that

this was not his first brush with the law, and that he had been interrogated by police when charged with juvenile delinquency and truancy. Granted that this was so, the only proof before this Court reveals that such prior experience was extremely limited, being restricted to brief encounters with a single woman detective at Klein's Department Store and a single traunt officer, in contrast to the all-night session with a series of detectives, patrolmen and district attorneys in the present case. These prior encounters of limited nature did not enable Castro to withstand the pressure that he had to face during the period in which he made his crucial "decision" to confess. See Haynes v. State of Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); United States ex rel. Smith v. State of New Jersey, 3 Cir., 323 F.2d 146, 156–157 (dissent). In view of his youth and limited mental capacity, Castro could not be compared to an adult who might have had some understanding of the consequences of his own admissions. An adult friend, appreciating the seriousness of Castro's predicament, would undoubtedly have advised him not to talk until a lawyer could be obtained. Certainly legal counsel would have advised him to stand on his Constitutional rights.

■ Of considerable significance in resolving the question of whether Castro's statement was a voluntary one is the fact that from 11:00 P.M. on August 23d, when he was taken into custody, until completion of the taking of the recorded question and answer statement at 11:45 A.M. on the following morning, Castro did not have any food, water, sleep or use of toilet facilities. On the other hand, as distinguished from Castro, detectives who questioned him testified that during their long night's interrogation of various suspects (including Castro) they were supplied with coffee and food. There is a conflict between Castro's testimony and that of others as to whether he was actually denied or deprived of food, drink and toilet facilities, various witnesses testifying that relatives and friends of other suspects were seen bringing coffee, food and drink into the station house where it was given to the police for other suspects. Even assuming, however, that food and drink were not intentionally withheld from Castro, the significant factor, for purposes of determining whether the statement given by him on the following morning was a voluntary one, is that he had not in fact had any food, water, sleep or use of toilet facilities for over 12 hours. Under such circumstances the absence of an intent to deprive him of these essentials is immaterial. See Davis v. State of North Carolina, 384 U.S. 737, 746, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). While the effect upon his strength and will to resist cannot be precisely measured, he was undoubtedly rendered more susceptible to psychological pressures, to "pushing" by McFarlane, and to leading questions put to him by police and the assistant district attorney, than if he had been accorded a night's rest and food and drink prior to giving his formal statement. The effect of absence of sleep is evidenced by the following, which appears in the transcript of the interrogation of him by Reynolds:

"Q. Are you sleepy?

"A. Yes."

The State seeks to avoid the weakening effects of the prolonged interrogation, coupled with lack of food, water and sleep, by pointing to Detective McFarlane's testimony that Castro's admission as to the stabbing was made at a relatively early stage, around 2:30 A.M., and that the recorded statement given by him to Assistant District Attorney Reynolds at 11:15 A.M. merely repeated and formalized his earlier admissions. The State argues that since the crucial admission was thus given before the sapping effects of the all-night session, the later recorded statement was not the product of coercion or compulsion and therefore was admissible at Castro's trial.

There is considerable doubt as to whether the crucial admission was made as early as 2:30 A.M., Castro testifying that he did not initially yield until around 6:00 A.M. or 7:00 A.M. Furthermore, the police apparently did not believe that any earlier admission clinched their case, since they continued their questioning until (according to McFarlane) Castro, at about 6:00 A.M. or so, identified one of two knives shown to him by McFarlane as being similar to the knife that he had used, even though he had previously stated that he had used a carpet cutter, not a knife. Thereafter McFarlane had a further session with Castro, before taking him to the lieutenant's room for questioning by Reynolds, in which McFarlane sought to insure that Castro would repeat his incriminating admissions when questioned by Reynolds. If, as the State now seems to urge, there was no need for further questioning of Castro after 2:30 A.M., the logical next step would have been to reduce his statement to a writing to be signed by him (a practice testified to by Detective Brennan as followed by some New York detectives), place him under arrest, and immediately arraign him. Yet the police continued their intermittent, or periodic, interrogation of him throughout the night, not merely for the purpose of "gilding the lily", but apparently because they were not satisfied with the information theretofore obtained and were seeking incriminating disclosures believed to be essential to their case, to the point where the ultimate recorded question and answer statement was obtained with the aid of leading questions at crucial points. These circumstances provide the basis for the not unreasonable inference that if Castro had not been subjected to such an all-night session, without food and sleep, he might not, at 11:15 A.M. on the following morning, have furnished the crucial recorded statement used at his trial.

Thus the undisputed facts with respect to the night's events hardly bear out the State's position. The all-night incommunicado interrogation smacks of the type of overreaching and over-zealousness that has been repeatedly condemned as constitutionally impermissible long prior to *Escobedo* and *Miranda*, and Castro's 11:15 A.M. statement is not saved by his earlier 2:30 A.M. admissions any more than that of the accused in Haynes v. State of Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963), where the Supreme Court said:

> "Neither the petitioner's prior contacts with the authorities nor the fact that he previously had made incriminating oral admissions negative the existence and effectiveness of the coercive tactics used in securing the written confession introduced at trial."

In conclusion, when the totality of all the surrounding circumstances is taken into consideration, this Court is forced to conclude that Castro's confession does not appear to have been the product of an essentially free and unconstrained choice on his part. On the contrary, for the reasons set forth so clearly 20 years ago by Justice Frankfurter in Haley v. Ohio, 332 U.S. 596, 598, 604–607, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (concurring opinion), the undisputed circumstances reveal a lack of fundamental fairness and due process, even when judged by pre-Miranda standards.

Accordingly, the Court finds that the admission into evidence of the statement obtained from Castro on the morning of August 24, 1959, requires that his conviction be set aside and directs that unless, within three months from this date, the State of New York affords Castro a new trial, at which the statement is excluded, he shall be released from custody.

The Court expresses its appreciation to Messrs. William P. Callahan, Joseph V. Kline and Robert J. Riordan for their arduous and time-consuming efforts as unpaid counsel on the petitioner's behalf.

So ordered.