UNITED STATES of America ex rel.
Juan CRUZ, Appellant,

v.

J. Edwin LaVALLEE, Warden, Auburn State Prison, Auburn, New York, Appellee.

No. 373, Docket 32124.

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1970.

Decided Sept. 13, 1971.

---

Thomas R. Esposito, New York City (The Legal Aid Society and Harry C. Batchelder, Jr., New York City, on the brief), for appellant.

Joel Lewittes, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., and Iris Steel, Asst. Atty. Gen., on the brief), for appellee.

Before LUMBARD and FEINBERG, Circuit Judges, and CLARIE, District Judge.*

LUMBARD, Circuit Judge:

This case raises fundamental and important problems dealing with whether failure to object to a coerced confession in a New York state court trial, held prior to Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), precludes the prisoner from raising the issue in federal habeas corpus

---

* Of the District of Connecticut, sitting by designation.

proceedings and having a hearing on the voluntariness of his confession. While we believe that the failure to object, by itself, does not constitute a waiver of the right to a hearing on voluntariness, we also recognize that in certain circumstances there can be a "deliberate bypass" of the right to question the voluntariness of the confession as a matter of trial strategy. Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Henry v. Mississippi, 379 U.S. 443, 450–452, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). When the record of the state trial reveals such a deliberate bypass clearly and beyond doubt, an evidentiary hearing in the federal courts as to whether there was a deliberate bypass is not required, and the state prisoner is barred from questioning the voluntariness of his confession on federal habeas corpus. As will be shown below, the record of the trial in the instant case manifestly reveals just such a deliberate bypass.

Juan Cruz was convicted by a jury in a New York County court of first-degree murder and second-degree assault; and on May 13, 1960, he was sentenced to life imprisonment. His conviction was affirmed, without opinion, by the New York courts, 12 A.D.2d 894 (1st Dept. 1961), 10 N.Y.2d 738, 219 N.Y.S.2d 410, 176 N.E.2d 916 (1961). His petition for coram nobis relief and for a *Huntley* hearing on the voluntariness of his confession were denied by Judge Sarafite in the New York County Supreme Court on the ground that he had failed to raise any objection at trial to the voluntariness of his confession. These rulings were affirmed by the Appellate Division, 26 A.D.2d 993, 275 N.Y.S.2d 241 (1st Dept. 1966), and leave to appeal to the Court of Appeals was denied.

Cruz then filed a petition for habeas corpus in the Northern District of New York alleging the unconstitutional admission into evidence of a coerced confession. On August 10, 1967, after studying the lengthy trial record, Judge Port denied the petition, without a hearing, on the ground that Cruz's failure at trial to object to the admissibility of the confession or to request a charge on voluntariness constituted a deliberate bypass of the state procedure for taking such action and precluded him from federal habeas corpus relief. The judge noted further that the

"record from beginning to end demonstrates a consistent, strategic and tactical approach, militating against raising any objection to the voluntariness of the statements made by him and used upon the trial. * * * To have done so in the face of overwhelming testimony against him would have directed the jury's attention away from the factors which Cruz and his counsel clearly hoped would influence the jury to reject a murder conviction."

Nevertheless, Judge Port granted Cruz a certificate of probable cause on the ground that "[t]he Court of Appeals of this Circuit has [evidently not] passed upon the question raised by [appellant]."

■ From a study of the 1,400 page record, we agree with the district court that it was the deliberate and consistent trial strategy of the defense not to question the voluntariness of the defendant's confession which was admitted into evidence against him. It follows that Cruz is not free to raise this issue in the federal courts. Accordingly, we affirm the denial of Cruz's petition.

The evidence offered at trial showed that Cruz, a seventeen-year-old boy, was the leader of a gang on the lower East Side of New York City which was known as the Forsyths and consisted mainly of Puerto Ricans, and that the Forsyths were embroiled in a bitter dispute with a rival gang, mostly black, known as the Sportsmen. The events leading to the incident in question here arose initially from a fight between Cruz and "Gypsy" Castro, the leader of the Sportsmen, on August 23, 1959. That evening, angered by the physical beating inflicted on their leader by Cruz, the Sportsmen came down with knives and zip guns to the Forsyths on Forsyth turf. In the ensuing fight, Julio Rosario, a twelve-year-

old boy and a friend of Cruz, was stabbed to death by Castro. See United States ex rel. Castro v. LaVallee, 282 F. Supp. 718 (S.D.N.Y.1968). The Forsyths then saw several black boys running with Castro back to Sportsmen territory.

Assuming that the Sportsmen had gone back to prepare to fight the Forsyths, and in revenge for Rosario's death, Cruz and the Forsyths immediately armed themselves with Molotov cocktails and a rifle and headed for Sportsmen territory. Cruz carried the loaded rifle, which he owned, under a raincoat and announced that he was going to shoot somebody. Upon arriving at the park where the Sportsmen were hanging out, Cruz and his confederates stationed themselves on a corner and readied themselves for the attack. Cruz got behind a parked car. Many persons of various ages were walking or sitting in the park, including a group of black boys and girls sitting on a long bench.

At a signal given by Gracias, Cruz's associate and codefendant, one of the Forsyths lit and heaved a Molotov cocktail into the park, causing people to run in confusion. Among those who were running was one Theresa Gee who had been sitting on the bench. Following the bomb came the combined yells of the other Forsyths calling upon Cruz to shoot. Thereupon, Cruz began to shoot at a group of youngsters whom he believed to be Sportsmen. The spraying bullets struck several of the fleeing youngsters; one bullet entered the skull of Theresa Gee as she was running from the bench and killed her. All the testimony was that the shots had come from the corner where Cruz was standing, and from that area the police recovered eight expended shells, all coming from Cruz's rifle. Cruz later admitted to a fellow Forsyth that he had shot a girl.

Cruz was arrested by four detectives at his mother's home sometime between 3:00 A. M. and 5:00 A. M. on August 24. He was taken to the police station and was questioned continuously by a group of detectives from sometime after 3:00 A. M. until approximately 9:42 A. M. at which time he signed a confession. There was some evidence that, at one point during the interrogation, he saw his mother outside and requested the opportunity to speak with her, but was not permitted to do so. As stated above, Cruz was seventeen years old at this time.

At trial the prosecutor read Cruz's confession to the jury, and defense counsel did not object.[1] Instead, Cruz took the stand on his own behalf and explained to the jury his chaotic social background and the reasons and provocations resulting in the gang war. He admitted that he had fired the shots at the Sportsmen and that to his knowledge he was the only one shooting in the vicinity. But he stated that he had not meant to kill anybody, and he tried to develop the circumstances surrounding the shooting to induce the jury to return a verdict for some lesser offense than murder. As Judge Port found, "the thrust of the defense was not to dispute the salient facts of the shooting * * * but to convince the jury that [Cruz] was acting in response to his environment and a basic instinct of self-preservation." In sum, the defense attempted to depict Cruz as an ill-educated, repentant young man, a product of a broken home and the social chaos rampant on the lower East Side at the time, acting in response to unwarranted aggression and assaults with deadly weapons upon himself and his friends.

Cruz argues on appeal that under Jackson v. Denno, *supra*, he is entitled to a hearing in the district court on the issue of the voluntariness of his confession. In Jackson v. Denno, the Supreme Court held unconstitutional the New York procedure by which an attack on an allegedly

---

1. Cruz was represented at trial by three distinguished lawyers appointed by the state: Alfred Norick, Esq., James D.

C. Murray, Esq., and Sidney J. Feltenstein, Esq., all of New York City.

coerced confession could be made only to the same jury which decides the guilt or innocence of the defendant. The Court held that to comply with due process, a defendant must be accorded a preliminary hearing outside of the jury's presence to question the voluntariness of a confession.[2] Subsequently, in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the Supreme Court made Jackson v. Denno retroactive.

According to Cruz, his petition for habeas corpus, as well as the trial transcript, clearly demonstrate a valid claim of a coerced confession; and since the trial here preceded Jackson v. Denno by four years, his failure to object to the introduction of that confession at trial does not preclude him from now having a hearing on the voluntariness of the confession. Cruz contends that the failure to object was dictated by the unconstitutional pre-Jackson v. Denno New York procedure: the defense could either challenge the confession as coerced, knowing that the jury would in any event hear the confession, or it could meet the confession by forgoing any objection to it and attempting to explain it and the underlying circumstances. The fact that defense counsel chose the latter in this situation, Cruz argues, should not deprive him of his right to a hearing under the retroactive Jackson v. Denno rule.

Thus, Cruz concludes that the district court erred in denying his petition without a hearing.

■■ While we agree with Cruz that the failure to object at a pre-Jackson v. Denno trial is not an automatic waiver of the right to a hearing on the voluntariness of a confession, defense counsel in some cases makes a deliberate decision as a matter of trial strategy to bypass challenging the voluntariness of the confession in any way. When all state procedures for questioning voluntariness are thus bypassed, the defendant *has* waived his right to a hearing in federal court on the issue. See Fay v. Noia, *supra,* 372 U.S. at 439, 83 S.Ct. at 849; [3] Henry v. Mississippi, *supra,* 379 U.S. at 450–452, 85 S.Ct. at 569 [4]; United States ex rel. Bruno v. Herold, 408 F.2d 125, 128–129 (2 Cir. 1969), cert. denied 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970). Cf. United States ex rel. Vanderhorst v. LaVallee, 417 F.2d 411, 412–413 (2 Cir. 1969) (en banc), cert. denied, McMann v. Vanderhorst, 397 U.S. 925, 90 S.Ct. 930, 25 L.Ed.2d 105 (1970). Even though the only alternative open to defense counsel for challenging a confession in a pre-Jackson v. Denno trial in New York was the procedure subsequently declared unconstitutional, counsel certainly realized that he could have raised the voluntariness issue in one form or another at the state trial; and if he de-

---

2. Jackson v. Denno, *supra,* changed only the procedure for contesting the voluntariness issue. It did not create a new right to challenge a confession on the grounds of involuntariness. It has long been established that "convictions following the admission into evidence of confessions which are involuntary, i. e., the product of coercion, either physical or psychological, cannot stand." Rogers v. Richmond, 365 U.S. 534, 540, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961). See also Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940).

3. There the Supreme Court stated:
"If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state

courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits.
\* \* \*"

4. There the Court stated, *inter alia:*
"Although trial strategy adopted by counsel without prior consultation with an accused will not, where the circumstances are exceptional, preclude the accused from asserting constitutional claims, \* \* \* we think that the deliberate bypassing by counsel of the contemporaneous-objection rule as part of trial strategy would have that effect in this case."

liberately chose not to do so, then the Jackson v. Denno rule, even though retroactive, is inapplicable.

It is true that in United States ex rel. Ross v. McMann, 2 Cir., 409 F.2d 1016, 1023 (1969) we said:

> The petitioner cannot be deemed to have waived his coerced confession claim by deliberately by-passing state procedures when the state failed to afford a constitutionally acceptable means of presenting that claim * *.

However, that opinion was overruled under the name of McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).[5] Accordingly, we do not regard it as binding on us. Moreover, even in Jackson v. Denno itself, the Court recognized the possible validity of the rule we adopt now when it pointedly indicated its awareness that Jackson's counsel questioned, at trial, the circumstances under which Jackson was interrogated. 378 U.S. at 374, 84 S.Ct. 1774, 12 L.Ed.2d 908. The Court stated that "[n]o one suggests that the petitioner, Jackson, ' * * * knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures,' the only ground for which relief may be denied in federal habeas corpus for failure to raise a federal constitutional claim in the state courts. Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837." 378 U.S. at 370 n. 1, 84 S.Ct. at 1777. Thus, Jackson v. Denno itself, as well as *Noia* and *Henry*, mandate that the deliberate bypass of a challenge at trial precludes the defendant from asserting the claim on federal habeas corpus.

Ordinarily, in a case where the state contends that the defense deliberately bypassed contesting the voluntariness of a confession, there should be an evidentiary hearing on that question in the district court, at which the burden would be on the state to show a deliberate bypass. See Henry v. Mississippi, *supra,* 379 U.S. at 450, 85 S.Ct. 564, 13 L.Ed.2d 408; United States ex rel. Snyder v. Mazurkiewicz, 413 F.2d 500 (3 Cir. 1969); United States ex rel. Montgomery v. Brierley, 414 F.2d 552, 558–560 (3 Cir. 1969), cert. denied 399 U.S. 912, 90 S.Ct. 2206, 26 L.Ed.2d 566 (1970); Maldonado v. Eyman, 377 F.2d 526 (9 Cir. 1967); Mitchell v. Stephens, 353 F.2d 129, 140–141 (8 Cir. 1965), cert. denied 384 U.S. 1019, 86 S.Ct. 1966, 16 L.Ed.2d 1042 (1966); State of Minnesota ex rel. Holscher v. Tahash, 364 F.2d 922, 927 (8 Cir. 1966). But when the federal judge on habeas corpus has made a full and accurate examination of the state trial record and has correctly concluded from it that deliberate bypass is clearly shown, then such a hearing is not required. See United States ex rel. Bruno v. Herold, *supra,* 408 F.2d at 129.

In the instant case, Judge Port made such a full examination and did not rely solely on the failure to object at trial. Our reading of the record confirms his conclusion that this is as plain a case as can be imagined of a defense counsel's deliberate choice, in pursuing a well-thought-out trial strategy, to bypass any challenge to the voluntariness of the defendant's confession and indeed to admit freely the essential facts contained therein.

In his opening statement to the jury, Cruz's counsel observed:

> "It is true that [Cruz] had the gun, we don't deny it, but when he took

5. The *Ross* opinion in our court actually dealt with applications for relief by two state prisoners, Wilbert Ross and Foster Dash. Certiorari was granted in these two cases and also in the similar cases of two other state prisoners, Willie Richardson and McKinley Williams, in which relief was granted the prisoners by this court. See United States ex rel. Richardson v. McMann, 2 Cir., 408 F.2d 48 (1969); United States ex rel. Williams v. Follette, 2 Cir., 408 F.2d 658 (1969). Because of the death of Ross, his case was never heard on the merits in the Supreme Court but the judgment of this court was vacated. 396 U.S. 118, 90 S.Ct. 395, 24 L.Ed.2d 303 (1969).

possession of that gun, in his own mind he was taking it for self-preservation, and when he went to this place where this unfortunate little girl was killed, he didn't go there to shoot at this little girl, he never saw the little girl in his life. The chances are that she never saw him.

"I know what the law is, and I know the law that His Honor will give you gentlemen in guiding you to find a verdict, and that you must obey, but I say to you gentlemen of the jury that he had no intent to kill anyone, his act was one of self-preservation, when he went there to the point where this little girl was shot. He knew that there were killing Sportsmen there and that is when he went there.

"Gentlemen, that is the story of this defendant. We propose to call as a witness, we propose to prove as far as we can, what I have told you now, and when you hear all of the evidence in the case, we ask you to do justice to this seventeen year old boy."

During the trial, the state's evidence that Cruz had fired the shot which killed Theresa Gee was overwhelming. Several eyewitnesses testified that they had seen a boy shooting a gun, and they made an in-court identification of Cruz as that boy. One of these witnesses testified that after he heard the shot which killed Theresa Gee, he saw Cruz crouching as if he had shot someone. Nester Cintron, a member of the Forsyths, stated on the stand that on the way home from the shooting, Cruz had told him: "I shot a girl." Moreover, one of the detectives who arrested Cruz testified that as he was taking Cruz to the police station, Cruz said "Well, I heard before that a girl is dead. But I didn't mean to do it. I didn't mean to kill anybody. I just wanted to scare them. * * * I just fired until there was no more bullets in the rifle." A police ballistics expert later testified that all eight shells discovered at the scene of the shooting came from Cruz's weapon, although because of the deformity of the bullet which killed Theresa Gee, he could not say definitely that

that bullet came from any particular gun. None of this evidence was contradicted by the defense.

At the time Cruz's confession was offered in evidence, the record reveals the following:

Mr. Reynolds [Assistant District Attorney]: "It is offered against the defendant Cruz."

Mr. Norick [One of the counsel for Cruz]: "No objection, your Honor."

The Court: "Received."

Mr. Reynolds: "I just want to be sure of something. May I, at the risk of wasting a minute, Mr. Norick, you have read the statement?"

Mr. Norick: "Yes."

The Court: "You desire nothing to be left out?"

Mr. Norick: "I do."

Later in the trial, as promised by defense counsel in his opening, Cruz took the stand in his own behalf and offered no testimony whatsoever on the issue of the voluntariness of his confession. Much of his testimony on direct examination described his family situation and the environment in which he grew up. He showed himself to be a boy from a broken home, shunted by family pressures between New York and Puerto Rico and living in New York in a neighborhood where gang war was a recurrent phenomenon. He testified extensively as to the provocation which led him and the Forsyths, on August 23, 1959, to arm themselves and go looking for the Sportsmen. As to the specific events surrounding the shooting, Cruz corroborated much of the state's case. The record shows the following on direct examination of Cruz:

"Q. Now, something happened at that time, did you hear something?

A. Yes, I saw a bunch of Sportsmen on the next side of the Avenue, the sidewalk. So they look like to me they are the same guys that went to Forsyth, and then Cubanno [one of the Forsyths] told me: 'Don't shoot I told you when.' I didn't know they was all the Sportsmen. When he saw this

group over there he told me, 'Burn 'em, burn 'em.' So that is when I start shooting.

Q. Cubanno yelled 'Burn them,' is that right? A. Yes.

Q. Now, Johnny, when you had the rifle in your hand were you aiming at any particular person? A. No.

Q. You were aiming at a group that you thought was Sportsmen, is that right? A. Yes.

Q. As a matter of fact, you fired one shot up in the air, didn't you? A. Yes.

Q. And you fired one shot on the ground, didn't you? A. Yes.

Q. Johnny, did you intend to kill anybody at that time? A. No.

Q. But you know someone was killed, is that right, Johnny? A. Yes.

Q. Now, Johnny, you were arrested thereafter, weren't you? A. Yes, my house.

Q. You were brought into a police station? A. Yes.

Q. And you were examined by Mr. Reynolds? A. Yes.

Q. Mr. Reynolds treated you nicely, didn't he? A. Yes.

Q. And you told Mr. Reynolds everything that you remembered at that time when he examined you, is that correct? A. Yes.

Q. Mr. Reynolds was a real gentleman, wasn't he? A. Yes.

Q. Johnny, you are very sorry for what happened, aren't you? A. Yes, I am sorry.

Q. If you had your life to live over again you wouldn't want it to have happened, would you? A. No."

On cross-examination of Cruz the following exchange occurred:

"Q. Then why did you have to tell [Cintron] later: 'I shot a girl?' A. Because nobody else went shooting there, only me. I figured I was the one who shot the girl."

In his summation, defense counsel did not even hint that there was any question as to the voluntariness of Cruz's confession. Indeed, he stated at the outset of his summation:

"Gentlemen of the jury, at this moment I am going to say to you, and I am going to be frank and not equivocate and not be foolish enough to try to deceive you, I am going to say to you here and now that my client Johnny Cruz is accountable in some degree for what happened to that little girl who was shot in the park who had every right to live, but, not murder, not murder, not murder, but what I believe will be justice."

Throughout the summation, defense counsel dwelt on Cruz's broken home and sordid surroundings and on the provocation caused by the Sportsmen, especially the killing of Rosario; but again and again he admitted that Cruz had the rifle, had fired it, and had in fact shot Theresa Gee: "It is true that Cruz had this rifle * * * Cruz didn't go there to shoot a little 15 year old girl who had every right to live, he went there to shoot at the Sportsmen * * * before this ill advised killing of this little girl, [Cruz] was in turmoil, mental turbulence, and mustn't it have had some impact on his mind?" Finally, Cruz's counsel stated:

"That is no defense in the law for what he did, again I say, but I say to you, gentlemen, it is on certain degrees of crime that is going to be charged to you by this Court. * * *

"Again I am going to beg you not for a moment to consider murder, murder in any degree. Please do not consider murder. I say to you again Johnny Cruz was no angel, that he has to pay for what he did, but not the penalty for murder, that is all I ask of you."

Defense counsel requested no charge to the jury with regard to the question of the voluntariness of Cruz's confession. None was given, and Cruz's counsel took no exception at all to the charge.

■ Although failure to object to the admission of a confession is not conclu-

sive evidence of a deliberate bypass, it is a factor to be considered; and here, as we have shown, it was conjoined with a consistent trial strategy not only not to challenge the admission of Cruz's confession in any way, but indeed openly to concede the facts contained in that confession. As just demonstrated, the defense was to admit that Cruz had killed Theresa Gee, but to argue that there were mitigating circumstances—a sordid environment, a need for self-preservation against an imminent attack by a rival gang, and a lack of intent to kill anyone, much less this little girl. Thus, even assuming that Cruz's confession was coerced, the record is eminently clear that the defense made a deliberate decision here to bypass all state procedures for challenging the voluntariness of that confession. In light of what we have said above, therefore, there is no need for an evidentiary hearing in the district court either on that issue or on the question whether there was a deliberate bypass here.

Cruz also seeks to gain a *Jackson* v. *Denno* hearing on the ground that Judge Mansfield granted one to Castro, the Sportsmen leader, in United States ex rel. Castro v. LaVallee, *supra*. In *Castro*, however, defense counsel *did* object at the state trial to the admission of the defendant's confession as involuntary and coerced. In the instant case, of course, Cruz's counsel not only failed to object, but deliberately adopted a strategy of bypassing the opportunity to contest the voluntariness of Cruz's confession.

■■ Finally, Cruz argues that the defense counsel's strategy of a deliberate bypass cannot be considered a waiver on the part of Cruz of his constitutional right to a hearing, since Cruz did not participate in that decision. Cruz cites several Supreme Court cases to show that "[a] choice made by counsel not participated in by the petitioner does not automatically bar relief." Fay v. Noia, *supra*, 372 U.S. at 439, 83 S.Ct. at 849. See also, e. g., Smith v. Yeager, 393 U.S. 122, 89 S.Ct. 277, 21 L.Ed.2d 246 (1968); Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).

We reject this contention. The Supreme Court stated in Henry v. Mississippi that "the deliberate bypassing by counsel of the contemporaneous-objection rule as a part of trial strategy would have [the] effect" of precluding the defendant from later asserting constitutional claims, even where the trial strategy was adopted by counsel without prior consultation with the defendant. 379 U.S. at 451–452, 85 S.Ct. at 569.[6] A lawyer must be able to determine questions of strategy during trial; and unless there are exceptional circumstances or unless the lawyer is so incompetent as to deprive the defendant of the right to effective assistance of counsel, his decision regarding trial strategy must be binding. See United States ex rel. Schaedel v. Follette, 447 F.2d 1297 at p. 1300 (2d Cir. Aug. 13, 1971); United States ex rel. Bruno v. Herold, *supra*, 408 F.2d at 128–129; United States ex rel. Agron v. Herold, 426 F.2d 125, 127 (2 Cir. 1970); Kuhl v. United States, 370 F.2d 20, 26–28 (9 Cir. 1966) (en banc). There are no exceptional circumstances here. Cruz makes no claim of incompetence of counsel nor would such a claim be justified since the record of the trial indicates, and the district court found, that Cruz's distinguished trial counsel adopted a reasonable, well-thought-out, and well-presented strategy in light of the overwhelming evidence against the defendant.[7]

Affirmed.

6. The Court's statement is set out in full in note 4, *supra*.

7. Cruz's counsel are listed by name in note 1, *supra*.