UNITED STATES of America ex rel. Alfred LEWIS, Petitioner,

v.

Robert J. HENDERSON, Superintendent, Auburn Correctional Facility, Respondent.

No. 76 Civ. 399.

United States District Court, S. D. New York.

July 16, 1976.

Lawrence Stern, Brooklyn, for petitioner.

Louis J. Lefkowitz, Atty. Gen., State of N. Y., New York City, for respondent; Joel Lewittes, David L. Birch, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

Alfred Lewis was convicted of bank robbery, grand larceny, and assault, after a jury trial in the New York State courts in 1958.[1] He was sentenced to a term of 30 to 60 years. Since then, he has persistently

---

1. All the charges related to the robbery of a branch of the Manufacturers Trust Company at 155th Street and Third Avenue in the Bronx at approximately noon on February 6, 1958.

sought to have his conviction vacated on the ground, *inter alia,* that confessions [2] introduced at his trial were the product of physical and mental coercion. These efforts started when, pursuant to a *pro se* coram nobis petition, a *Huntley* hearing was held in January 1970 by Justice 'Edward T. McCaffrey, who had presided at the original trial, to determine whether the confessions were the product of unconstitutional coercion. In an opinion dated March 24, 1970, Justice McCaffrey denied the application, finding that the confessions "were voluntarily made and were not the result of physical coercion of any kind." The decision was affirmed without opinion, 35 A.D.2d 1086, 316 N.Y.S.2d 191 (1st Dep't 1970), and leave to appeal to the Court of Appeals was denied. A *pro se* habeas corpus petition was then filed in the Western District of New York, again attacking the voluntariness of the confessions. Judge Curtin, in an unpublished memorandum opinion, denied the petition by order dated June 28, 1971, on the ground that the *Huntley* hearing had adequately determined the issue. Both Judge Curtin and the Court of

Appeals denied a certificate of probable cause, and the Supreme Court denied certiorari.

Still moving *pro se* (although assisted by a brief of the Cornell Legal Assistance Project), petitioner filed the instant petition in the Northern District of New York on July 17, 1974, raising the voluntariness issue along with the adequacy of the state court proceeding. The petition was denied by Judge Port. This time, however, the Court of Appeals granted a certificate of probable cause, assigned counsel, reversed "as to the issue of mental and psychological coercion", and remanded for a hearing to resolve the factual disputes on that issue. *United States ex rel. Lewis v. Henderson,* 520 F.2d 896 (2d Cir.), cert. denied, 423 U.S. 998, 96 S.Ct. 429, 46 L.Ed. 373 (1975).[3]

Judge Port continued the assignment of counsel and transferred the case to this district for a hearing, which was held on April 5, 1976. Having reviewed the evidence, which is summarized below, and the legal arguments of the parties, the court concludes that the writ must issue.[4]

**2.** There were actually three verbal confessions. The first was made to a Detective Corbett. Petitioner then repeated the same admissions before a number of other detectives, with Corbett by his side. Petitioner recounted his confession a third time before the District Attorney and a stenographer. All of these confessions were to the same effect and given within the space of an hour and a half on the same day. Copies of the recorded confession were introduced at petitioner's trial. Detectives Beckles and Corbett testified concerning the two unrecorded confessions. Petitioner also asserts that evidence of his leading the police to marked money from the bank and the money itself constitute a fourth "confession." Although this characterization was apparently rejected by the state judge presiding over the *Huntley* hearing, it would seem that the same constitutional claims apply to this evidence as well.

**3.** The question whether petitioner was beaten, as he continues to swear, appears to have been resolved finally against him by the decision of the Court of Appeals. The Circuit upheld Judge McCaffrey's finding that petitioner's confession was not the result of physical coercion of any kind. 520 F.2d at 904. However, since Judge McCaffrey made no findings of fact, it is not perfectly clear whether he found that (a) there had been no physical abuse whatever or (b) whatever abuse there was, if any, did not

cause petitioner to confess. It is at least arguable, then, that it might be open to this court to determine whether there were any beatings and, if so, whether they contributed to petitioner's allegedly coerced confessions. In the end, however, the court has concluded that the issues of physical abuse and physical coercion are foreclosed by the Circuit's decision and has assumed that petitioner was not beaten and that his confession was not physically coerced. While this bifurcation may effect a small note of unreality, the task of deciding only what the court was directed to decide has proved wholly manageable.

**4.** Before Judge Port, petitioner also raised the argument that the trial court had failed to properly charge the jury concerning voluntariness. The petition was denied on this ground:

"Petitioner's second contention has previously been passed upon by Judge Curtin and found to be without merit. *United States ex rel. Alfred Lewis v. Mancusi, supra,* decision of August 3, 1971. I am satisfied that the ends of justice do not require this court to reexamine that determination, and this contention is also denied and dismissed. 28 U.S.C. § 2244(a)."

Memorandum Decision and Order of Judge Port, 74 Civ. 366, at 4 (N.D.N.Y. August 20, 1974). The issue was not raised on appeal, see

## I.

The evidence adduced at this court's hearing included the testimony of petitioner and of Dr. Lawrence Lichenstein, a psychologist, in support of the petition. Respondent presented Vincent Beckles and William Corbett, two of the detectives who questioned petitioner prior to his confessions. Exhibits included the transcript of the *Huntley* hearing, where Beckles and Corbett, but not petitioner, also testified, and the transcript of the trial, which included testimony of petitioner,[5] Beckles, and Corbett.

*Petitioner's Testimony*

At the hearing before this court, petitioner testified as follows:

He was picked up by the police at approximately 8:30 p.m. on February 17, 1958, and taken to the 30th Precinct, where he was questioned about some money the police claimed to have heard he possessed. When asked where he got the money, he said that he had won it gambling. The questioning started at a desk in a large room. After a few minutes there, petitioner was taken to a room containing "nine or ten beds," where he was seated in a chair. Initially, an Inspector Walsh asked most of the questions. Shortly after the interrogations began, a Detective Corbett came and actively participated in the questioning. Petitioner refused to tell where the money was, so he was beaten, primarily by Corbett and Walsh, but also by several others, as there were always six to eight, or more, people in the interrogation room. Later in his testimony, petitioner also recalled that Inspector Walsh

"asked me if I wanted to call somebody, wanted to make a telephone call, and I didn't have this in mind, although when he said it I immediately thought of calling my family and I said yes. And he said, 'Well, if you cooperate, you can make a telephone call, you just tell us what we want to know and tell us where the money is and we'll let you call.' And I said—when I said I couldn't do that, he said, 'Well, you can't make a telephone call.' "

Later that night, petitioner was taken to his apartment, where some of his clothing and personal property were gathered. He was then returned to the 30th Precinct, where the police "held an identification session where I was told to put on various articles of clothing and put on this hat and that hat, and so forth and stand before a peephole for identification purposes." There were several detectives in the "identification room," but apparently only petitioner was placed before the peephole for identification. Petitioner was then taken back to the room with the beds in it, where he was left for a few hours, although there "was always someone in the room with me."

The questioning resumed about 2 or 3 o'clock in the morning, at which time petitioner was told that he had been positively identified as the robber, and that he should admit the robbery, cooperate, and produce the money. No one ever told him that he had been arrested for the robbery, that he had a right to a lawyer and a right to remain silent, or that what he said could be used against him in a court of law. Petitioner continued to be beaten and questioned throughout the night. He had no food and was permitted no sleep. He saw detectives with coffee and sandwiches, "but I never was offered any food." The interrogations at the 30th Precinct continued into the morning of February 18th.

About noon or 1:00 p.m. on the 18th, petitioner was taken to the 42d Precinct. Lewis said that he was "tired, . . . weak, . . . exhausted, . . . almost beaten . . . ." at the time of the transfer. At some point, either shortly before or after being moved, he was told that

---

520 F.2d at 903, and is not now before this court on remand, despite some belated attempts by petitioner to raise it in his post-hearing briefs. In any case, the contention having been twice denied on federal habeas applica-

tions, there is no persuasive reason to consider it again.

5. Petitioner's trial testimony was limited to the issue of the voluntariness of his confessions.

he was being charged with an assault. When he got to the 42d Precinct, with Detective Corbett "running the show," petitioner was again questioned by several detectives concerning the location of the money.

One of the detectives—not Corbett—told petitioner that the assault charge would be dropped if he "cooperated, confessed and primarily produced the money."[6] When he refused, Corbett and the others started beating him again, and told him he would stay there until they got the money. After the beatings had continued for about half an hour, petitioner "couldn't . . . keep taking that kind of stuff" and told Corbett that the money was on a roof at an unspecified location. Petitioner did not, at this time, admit that the money was the bank money, but did agree to take the police to it.

Petitioner was then left alone for a few minutes in a detention pen. When Detective Beckles came to take him to get the money, petitioner refused to go, whereupon Beckles promised that "if I took him to the money that my contention that the money was mine as a result of gambling winnings would not be—you know, would not be attacked . . . ." Fearing that the police might steal his money as they had his watch and gloves at the 30th Precinct,[7] Lewis insisted that a Mr. Joey Jones, whom he had seen in the 42d Precinct, would have to come along as a witness before he would even consider leading the police to the money.[8]

At this point, Beckles left the room and Corbett came in and told petitioner that he would "be smart to go along with Beckles, because if you don't get that money you are going to answer to me." Corbett then left the room. Beckles reentered and informed petitioner that it had been arranged for Jones to accompany them when they went for the money.

At about 2:00 p.m., petitioner, Jones, Beckles, and Cook, Beckles's partner, left to get the money. After the money had been retrieved and they were driving back, petitioner asked Detective Beckles for a receipt. Beckles promised him one when they got to the stationhouse. When they arrived back at the 42d Precinct at about 3:30 p.m., however, Corbett took charge again. He threatened that if petitioner did not shut up about the receipt, "you will get a receipt in the mouth," and told him to "come clean and admit to the robbery now because we've got the money." Corbett then took petitioner to a room where Corbett beat him while he was held by another detective. After this last beating, petitioner confessed to the robbery.

Corbett then took Lewis to a squad room where Inspector Walsh, Detective Beckles, and several other police officers were gathered. In response to their questions, petitioner gave the answers Corbett had instructed him to before they entered the squad room. Then, after a short period of time in the detention pen, petitioner was taken into another room where he repeated

6. Petitioner made these remarks regarding the alleged promise:

"You know, it is hard to say whether anything like that is going to have an effect, but I'm just saying this: when they got a little tougher . . . it is possible that I thought about that promise . . . and perhaps I think they moved me closer to the disclosure point. I am not saying it did."

7. Petitioner claims that the detective who made him empty his pockets kept his leather gloves and that another officer later confiscated his watch.

8. Later, petitioner testified:

"I knew if I didn't [take them to the money], you know, I was going to be beaten again, you know, and like some fellow said, you know, that is the reason I was up there, they was keeping me there for that purpose . . . .

"And the fact that they had played this game on me, you know, told me that they was going to—told me that they was not going to contest my saying that the money was mine as a result of gambling monies, and that then after I got back, led them to the money and got back to the station—got back to the precinct, you know, they made it clear, you know, that that was just a sham, you know, this also had an effect on my condition, you know, on bringing me closer to the point where I couldn't resist nothing else, you know."

his confession before an assistant district attorney and a stenographer. Petitioner was then taken downstairs and put in a cell, where he remained for the night. At about 10:00 a.m. on the morning of the 19th, he was arraigned.

### Dr. Lichenstein's Testimony

Dr. Lichenstein, Chief Psychologist at Kings County Hospital, reviewed and interpreted two reports prepared at Bellevue Hospital in March and June of 1958 wherein the description of petitioner said: "Severe Character Disorder, Sociopath of the Schizoid Type; a type of individual, who, under stress and strain, may develop a psychotic episode in future." Dr. Lichenstein testified that a sociopath, in addition to possessing other maladaptive characteristics, "tends to be rather infantile and immature, has a low frustration tolerance and [sic] prone to panic under stress." He described a psychotic episode as a "breakdown in ego functioning or a breakdown in the ability to think clearly . . . usually evidenced in confusion, disorientation." In response to a hypothetical question regarding petitioner's experiences prior to the confessions,[9] he concluded that it was more probable than not that petitioner had a psychotic break under the assumed conditions. He went on to say that even if petitioner had not experienced a psychotic episode as such, a person with his diagnosis would have suffered a weakening in his power to reason and to resist authority under the described circumstances.

### Detective Beckles

Mr. Beckles, called by respondent, gave testimony essentially as follows:

In response to her telephone complaint to the police that a man had threatened her with a gun, Beckles arrived at Ms. Elizabeth Waller's apartment at about 8:30 p.m.

on February 17th. As Beckles and Waller were emerging from an elevator in the apartment building on their way to the stationhouse, they encountered petitioner in the hallway. Ms. Waller said that this was the man who had threatened her. Thereupon, Beckles informed petitioner that Waller had made a complaint that petitioner had assaulted her and that he was taking him to police headquarters. Beckles took petitioner to the Detective Squad of the 30th Precinct, where he was questioned first about the alleged assault. Petitioner said that he knew Ms. Waller because she lived in the same building as his mother, but denied any assault.

Detective Beckles, however, had called the 42d Precinct to have them bring any witnesses who might be able to identify the robber of the Bronx bank. This action was prompted by the fact that the complaining witness had stated that petitioner had given her a bag to keep which contained a large sum of money and a gun, and that, upon entering the stationhouse, Beckles had seen fliers relating to the bank robbery. The witnesses were brought down between 10 and 11 p.m., perhaps later. Although he did not take part in the identification proceedings that followed, he was informed that the witnesses had identified petitioner as the bank robber.

After the identification, petitioner was questioned by several detectives on and off during the entire night in the Precinct's "dormitory room." Detective Beckles, however, spent only about ten minutes questioning Lewis after he was identified. When petitioner was not being questioned, he was left in the squad room where he sat on a chair. Detective Beckles offered petitioner food during the evening at the time he was offering it to other detectives, but petitioner declined the offer. Beckles does not know if petitioner ate or slept that

---

9. "Is it possible that the individual described in that report, Doctor, subjected to sudden arrest, 19 hours of continuous interrogation overnight without food and sleep, without counsel from friends or lawyers, or anyone else on his side, subjected to a constant barrage of questioning, interrogation and accusations mixed in with promises of assistance . . . is it possible that the person described in that report under those circumstances had a psychotic break?" The original question contained the additional clause "and subjected to beatings." The question, however, was asked a second time without that clause.

night. Beckles never struck or beat petitioner.

During the course of the night, petitioner wanted to see a friend who came to the stationhouse. Beckles does not recall whether petitioner actually saw him or not. At one point during the course of the evening, Beckles went out with petitioner, presumably to get the clothing. Beckles went out at some other point with other detectives to search for the bank money in the apartment of a Mr. Johnson whose name and address had been obtained from the address book taken from petitioner at the time of his arrest.

By morning, the Borough Commander had decided to turn petitioner over to the 42d Squad on the bank robbery charge. Beckles drove petitioner to the 42d Precinct. There, Beckles continued to speak with petitioner, but did not participate in the interrogation. Beckles told petitioner that if the money was his, he could keep it, but he did not say petitioner could keep it no matter what. At the 42d Precinct, Beckles also told petitioner that the police at that precinct wanted the money, and that he (Beckles) was going to leave the 42d Precinct and would thereafter have nothing more to do with the proceedings. Eventually, Beckles, together with one of his partners, took petitioner and a friend to retrieve the money.

*Detective Corbett*

Detective Corbett, the other witness for respondent, testified that sometime after 10:00 p.m. on the evening of February 17, 1958, he received a telephone call from his precinct (the 42d) to the effect that the 30th Precinct was holding someone that they had reason to believe might be connected with a bank robbery he was investigating. After determining that the suspect had a space between his two front teeth,[10] Corbett called the 42d Squad and told them

that he was going to the 30th Precinct and that they should arrange for the eyewitnesses to go there too.[11] Corbett arrived at the 30th Precinct shortly before midnight, and then remained all night. Upon his arrival, he was informed that the witnesses who had viewed petitioner had identified him as the robber.

Corbett had a brief conversation with petitioner that night, when petitioner accompanied him and other detectives to a residence in Harlem. Apart from that, Corbett did not interrogate petitioner that evening. During most of the night, Corbett was not with the higher-ranking 30th Precinct officers who were questioning petitioner.

As Corbett, Beckles, and Cook were driving petitioner between the 30th and 42d precincts the next morning, petitioner was questioned further and urged to take the police to the money. Corbett never told petitioner that he would be kept at the stationhouse until they got the money and cannot recall if he ever promised him that he would help him if he revealed the location of the money. After more questioning at the Precinct, petitioner agreed to take Beckles and Cook to the money.

When petitioner returned from getting the money, he requested, but was not given, a receipt. Instead, Corbett took him into a bedroom and "convinced him in my way of thinking, I convinced him that he was really identified." Thereupon, without further urging, petitioner started his confession. After he told the whole story, Corbett took petitioner to the Squad Commander's Office and told him to "tell them now what you told me." He never told petitioner what to say. After petitioner repeated his confession in the squad room, the district attorney and stenographer were called.

Corbett does not recall that petitioner was ever offered any food in his presence or

---

**10.** One of the eye-witnesses recalled this feature after the identification fliers had been prepared.

**11.** Corbett later testified that detectives at the 42d Squad had already instructed the witnesses

to go to the 30th Precinct, which would explain why at least some of the witnesses arrived at the Precinct between 10:00 and 11:00 p.m. and Corbett not until shortly before midnight.

that he ever saw petitioner eat or sleep at either the 30th or 42d Precinct. Corbett testified that he never beat or struck Lewis. He did not advise petitioner of his constitutional rights. While he and his colleagues probably had grounds to arraign petitioner when he was turned over to them on the 18th and before he led them to the money, he was not arraigned until the 19th because the investigation had not been finished in time to permit an earlier arraignment.

The testimony given on prior occasions, at trial and at the *Huntley* hearing, is essentially cumulative in nature. Some aspects bear mention, however. Petitioner's only prior testimony was at the trial; he did not testify at the *Huntley* hearing. At the trial, he testified that, at one stretch on the evening of the 17th, they left him in the room with beds for three or four hours. "Once in a while one detective would come in; he would leave, and another detective would also come in. You know, after the other one had left, and about—I lost track of time—but about three or four hours later they began questioning me." Petitioner stated that "when like I said one detective would stay in there for a while with me, and I did sort of doze off in a—in the chair, they'd wake me up."

As for the events at the 42d Precinct, in his trial testimony, petitioner remembered being told that they were charging him with assault in Manhattan, and that the charge would be dropped if he took them to the money. He also said that he confessed "solely because of the threats and the beating and the lack of food," and that neither Detective Corbett nor the District Attorney had promised him anything. Nothing was said about being denied a telephone call [12] or about Mr. Beckles's alleged promise to accept his gambling earnings story if he took them to the money.

Beckles and Corbett testified both at the trial and at the *Huntley* hearing. Beckles said nothing at either time about an offer

of food to petitioner. At trial, Corbett was able to recall that he might have promised to help petitioner "a little" by promising to "help him if I could when I got to court if he would co-operate with us."

## II.

■ The stubbornness with which petitioner has pursued his constitutional claims during over 18 years of confinement was not matched on February 18, 1958, when he gave in after 19 hours or so and confessed to the bank robbery. Phrasing the test broadly, petitioner's confession violated due process, and was thus inadmissible at trial, if "the totality of circumstances" leading to the confession show that it was not "the product of a rational intellect and a free will. . . ." See *Fikes v. Alabama*, 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960).

The evidence in the now amplified record demonstrates that petitioner was worn down, that his will was overborne, and that he yielded to a combination of fatigue, despair, and weakness, all produced by his captors and interrogators. This court would so hold upon the evidence and the record if this were the initial habeas proceeding. But our inquiry and the grounds of today's decision have been considerably narrowed by the mandate of the Court of Appeals. Focusing the general principles upon the circumstances of this case, that court has directed us to consider six factors touching the voluntariness of petitioner's confessions. Following that direction, we are driven compellingly toward the granting of the writ.

■ The higher Court instructed that six specified allegations, or clusters of allegations, by petitioner would require issuance of the writ if they could be sustained on the remand. Finding them to be sustained, or vindicated so substantially as to permit no

---

12. At the hearing, Mr. Lewis explained:

"I didn't testify to this at the original trial because I didn't know the value of this kind of testimony and apparently my lawyer,

who—at the trial, he was not familiar with all the factors of mental coercion because he didn't instruct me to testify in this regard . . . ."

other result, we reach the conclusion the mandate requires.[13]

> (1) "He was never once, during the whole period of pre-arraignment interrogation, advised of his right to remain silent or of his right to counsel."

This is undisputed. It is, of course, a solid factor favoring petitioner.

> (2) "According to Lewis he was arrested on the pretense of Mrs. Waller's alleged complaint, held for approximately 38 hours by the police during which time he was neither booked nor arraigned, and questioned during most of the first half of this period."

Although it does not appear that the arrest of the petitioner was "on a pretense," the remainder of the quoted factor, which is the portion that goes after all to the relevant issue of coercion and deprivation, is solidly established by the several records of evidence in this case. It is perfectly clear that the petitioner was held in close and isolated confinement for 38 hours during which he was neither booked nor arraigned. It is equally clear that he was questioned "during most of the first half of this period." As one detective told it, petitioner was "questioned about [the] money all night long", and he kept "insisting . . . all along during the night [that it was his money]", before he was broken on the following day and submitted to the will of his interrogators. Such interruptions as there were served only to accentuate the thoroughness of his subjugation and the futility of any attempt to resist.[14]

The extraordinary delay in arraignment, condemned by state no less than federal procedural law, was totally devoid of justification, at least once the night had passed.[15] As is evident from Detective Corbett's testimony, the delay was for the clear and explicit aim of having the petitioner under total control for the purposes of locating the money and extracting a confession before he was allowed access to anyone else or to any of the forms of the law's protection. In light of the eye-witness identifications, it is obvious that the continuing "police interrogation was essentially incriminatory rather than merely investigatory in nature," *United States ex rel. Castro v. LaVallee,* 282 F.Supp. 718, 724 (S.D.N.Y. 1968), and must be condemned as such. See also *United States ex rel. Montgomery v. Mancusi,* 338 F.Supp. 1247, 1251 (S.D.N.Y. 1972).

> (3) "During his extended period of detention before and after confession, Lewis was not allowed to make any telephone calls, was not allowed to see anyone and, with one minor exception, saw and spoke to no one but the police."

Again, the record establishes conclusively the propositions in the quoted statement.

---

**13.** The parties have briefed and argued the somewhat open question as to the burden of proof. There is substantial authority that in circumstances like the ones here, the burden is upon the State to establish the voluntariness of the confessions. *United States ex rel. Castro v. LaVallee,* 282 F.Supp. 718, 722 (S.D.N.Y.1968); *United States ex rel. Smith v. Yeager,* 336 F.Supp. 1287, 1301–02 (D.N.J.), affirmed per curiam, 451 F.2d 164 (3d Cir. 1971); *United States ex rel. Thurmond v. Mancusi,* 275 F.Supp. 508, 520–21 (E.D.N.Y.1967); *United States ex rel. Senk v. Brierley,* 363 F.Supp. 51 (M.D.Pa.1973).

As the record stands, however, there is no need to go nearly that far. Accepting respondent's position that the burden is petitioner's (by a preponderance of the evidence), this court reaches the findings and conclusions hereinafter outlined.

**14.** The interruptions included two, and perhaps three, trips with, and at the instance of, various detectives. The first was to petitioner's residence, which the police searched and from which they "seized" some clothes and other personal belongings. At some point in the early hours of the morning, detectives searched the apartments of two of petitioner's friends after obtaining their names and addresses from petitioner's address book. It is not entirely clear whether petitioner accompanied the detectives on this mission, but he was at least aware that it took place. The final "diversion" was the trip with Beckles, Cook, and Jones to Manhattan to retrieve the money. The car ride from the 30th to the 42d Precinct on the 18th does not qualify as an interruption because the detectives questioned petitioner throughout.

**15.** Both Detectives Beckles and Corbett testified that they thought arraignment would have been impossible before the morning of the 18th when the Criminal Court reopened.

The petitioner was completely walled off during the many hours of his custody. It was made clear to him that his situation of close and isolated custody could not be expected to change until he had done the officers' bidding. The "minor exception" from the condition of isolation from friends or family was solely a bargaining ploy to "encourage" Lewis to lead the police to the money. Solely for this purpose, they acceded to petitioner's request that his friend Jones could accompany them as a kind of witness. So far as that is an "exception" at all, it is not one that diminishes the impact of petitioner's totally controlled environment during interrogation.

> (4) "Lewis was continuously interrogated throughout the night of February 17 and on into February 18 on an intermittent basis without being given any real opportunity to sleep or any substantial food."

Once again the record is clear to the point of being substantially undisputed on this significant set of conditions. This court has noted earlier the admittedly continuous character of the interrogation. There is no real question that the petitioner was deprived of food and sleep, with all the debilitating consequences of these conditions.

Some equivocal intimations that food was brought into or out of the room where petitioner was held are without significance for the main point that petitioner was neither given any food nor given any reason to hope that a request for it would be effective. Detective Beckles's testimony at the hearing that he offered petitioner food at the 30th Precinct is largely, if not totally, discredited by his failure to recall this act of benevolence at either the trial or the *Huntley* hearing.

Petitioner testified that he had not slept at all between the time of his arrest and his confession. None of respondent's witnesses could contradict his contention. To be sure, petitioner's trial testimony that he had been left alone for three or four hours on the night of the 17th in which he "dozed off" from time to time, only to be awakened on each occasion by one of his interrogators,

casts doubt on his broader claim here of total sleep deprivation. However, it remains clear that petitioner slept very little, if at all, between the time of his arrest and confession.

In the end, the court finds that petitioner was in fact left to suffer the pangs of hunger and the impairments caused by sleeplessness. The effects of such deprivations can only have impaired his ability to think straight and resist pressure. They weigh heavily in the picture pointing toward the involuntariness of petitioner's confession.

> (5) "Lewis, at the time of his confession, was a young 22-year old black man of limited education with apparently little prior experience with police methods, thus rendering him particularly susceptible to police pressure."

At age 22, the petitioner was certainly not as young as some whose names have been identified with confessions held invalid because their youthful wills were "overborne." Nevertheless, the factor just quoted, already held significant by the Court of Appeals, remains a substantial one in the case. We have been repeatedly instructed that "the process of determining voluntariness involves more than 'a mere color-matching of cases' . . . ." *Mancusi v. United States ex rel. Clayton*, 454 F.2d 454, 456 (2d Cir.), cert. denied, 406 U.S. 977, 92 S.Ct. 2413, 32 L.Ed.2d 677 (1972); *Reck v. Pate*, 367 U.S. 433, 442, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); *Beecher v. Alabama*, 389 U.S. 35, 38, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967).

Though he was all of 22, this petitioner was diagnosed by contemporaneous psychological evaluations as a sociopath and "a type of individual, who under stress and strain, [might] develop a psychotic episode in [the] future." Dr. Lichenstein testified that a sociopath "tends to be rather infantile and immature" and that it was more probable than not that petitioner "suffer[ed] a psychotic episode" in the conditions of extended custody and interrogation. While the court does not fully accept Dr. Lichenstein's conclusion, it seems highly

likely that petitioner was relatively young (emotionally and intellectually as well as chronologically), unstable, and vulnerable at the time he was interrogated. Such characteristics rendered him particularly susceptible to police pressure.

It is true, as respondent stresses, that petitioner had already been imprisoned once for a serious criminal offense, and was thus no stranger to the forces of the criminal process. It does not follow by any means, and the record does not suggest, that he had significant "prior experience with police methods." So far as the law is concerned, "even a long criminal record" is not sufficient to erase or overcome such problems of immaturity, ignorance and simple-mindedness as our Court of Appeals identified, and as the Supreme Court has held important, for decision of questions like the one now considered. See *Davis v. North Carolina*, 384 U.S. 737, 742, 752, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

> (6) "The police detectives made various promises to petitioner, including an offer to 'help' him with his case if he confessed and a pledge that his claim of ownership would not be challenged if he would only retrieve the money."

Once more, on this final topic, the proof is ample in favor of the petitioner. Rationally, in the comfort of the courthouse or a lawyer's office, it seems absurd to suppose that police would have told the petitioner "his claim of ownership would not be challenged" even if it turned out that he had robbed the money from a bank. Nevertheless, the record makes it evident that this is substantially what the police actually said, and it is even more clear that this is what they contrived to lead him to believe. Indeed, the Court of Appeals in its first review of this case seems to have found from the existing record a promise by the officers "to accept his claim that the money in the briefcase was gambling winnings . . . ." 520 F.2d at 899. It has been evident from the time of petitioner's trial that the detectives who interrogated him were quite willing to lull and pressure him by promises of friendly assistance.[16] The several records of testimony are replete with specific promises of "help" in return for a confession. In sum, the sixth and last of the Court of Appeals standards is met beyond any serious question.

It follows, as the Court of Appeals said it should, that petitioner's "confession was obtained in violation of his Due Process rights."

### III.

The respondent maintains that even if petitioner's confessions were involuntary, as the court has now held, their admission at his trial was harmless error. Assuming that the Circuit has not foreclosed this issue by its mandate,[17] this court rejects the argument on the merits.

It has been held that the admission of a coerced confession can, in rare circumstances, constitute harmless error. See *United States ex rel. Moore v. Follette*, 425 F.2d 925 (2d Cir.), cert. denied, 398 U.S. 966, 90 S.Ct. 2180, 26 L.Ed.2d 550 (1970) (prior untainted confession also in evidence). This is not such an extraordinary case.

In addition to the involuntary confessions, the evidence introduced at petitioner's trial consisted of (1) the testimony and in-court identification by seven eye-witnesses, (2) the testimony of Elizabeth Waller that Lewis asked her to store a briefcase for him, which she later learned contained large amounts of packaged money, (3) a

---

**16.** Typically, one of the detectives quoted himself as saying: "Now, you have to put your trust in somebody, and we are the ones who can help you," and, the officer continued, "it was right after that that we sat down and he started to tell me" about his commission of the bank robbery.

**17.** Having concluded that there were unresolved factual issues as to mental and psychological coercion, the Court of Appeals remanded for a hearing "[s]ince a state court conviction tainted by an involuntary confession cannot stand under the Due Process Clause . . . ." 520 F.2d at 904. Having failed to raise the question of harmless error in the Court of Appeals, the respondent might be held to have waived the contention.

matchbox and sheet of paper upon which petitioner allegedly made, or directed Ms. Waller to make, computations as they counted the money contained in the briefcase, (4) testimony by Beckles and Corbett that petitioner had led them to approximately $8,000 in cash, including two $5 bills that had been marked by one of the bank tellers, (5) the money itself, and (6) the testimony of the patrolman who found the stolen car allegedly used by petitioner in the bank robbery.

The case against petitioner was strong even without the confessions. But not all of the other evidence was itself free from taint and other weaknesses. Whether or not the fact that Lewis led the police to marked money taken from the bank and the money itself are regarded as additional "confessions,"[18] it is clear that they at least suffer from the same constitutional taint, see *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and must be disregarded as independent evidence. The testimony regarding the stolen getaway car must be discounted because, without petitioner's confessions, there would have been nothing to link him to the car. Similarly, while Waller's testimony and the computation slips were circumstantial evidence that petitioner had robbed the bank, they did not conclusively establish the origin of the money since petitioner never told Waller where he got the cash.

After disregarding the tainted evidence and discounting the evidence otherwise dependent upon the confessions, it is obvious that the court cannot say that "beyond a reasonable doubt," the confessions "did not contribute" to petitioner's conviction. *Chapman v. California*, 386 U.S. 18,

18. See note 2 *supra*.

19. After remand, petitioner attempted to inject the further claim that his conviction was based upon tainted identifications in court following impermissibly suggestive lineups. If the court were to reach that issue, it would be resolved against petitioner. While it appears that the out-of-court identifications were indeed improper, in light of the witnesses' degree of certainty and the extensive cross-examination

24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See also *United States ex rel. Moore v. Follette, supra*, 425 F.2d at 928. To be sure, the eye-witness identifications, while not perfect,[19] were powerful independent evidence of petitioner's guilt. But nothing is quite so damning as a defendant's own admission of guilt. Here, unlike the situation in *United States ex rel. Moore v. Follette, supra*, all of petitioner's confessions were involuntary. See *United States ex rel. Montgomery v. Mancusi, supra*, 338 F.Supp. at 1252.

In all these circumstances, the court holds that the admission of the confessions was harmful constitutional error.

Accordingly, the petition should be, and it is, granted. Petitioner will be released from custody unless the State brings his case on for retrial within sixty days.

It is so ordered.

at trial, the in-court identifications did not violate due process and taint petitioner's conviction. See *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). However, the out of court deficiencies do diminish to some degree the evidentiary value of the in-court identifications.